**KEEBLER COMPANY, Plaintiff, Appellee,**

v.

**ROVIRA BISCUIT CORPORATION, Defendant, Appellant.**

**KEEBLER COMPANY, Plaintiff, Appellant,**

v.

**ROVIRA BISCUIT CORPORATION, Defendant, Appellee.**

Nos. 79–1483, 79–1484.

United States Court of Appeals, First Circuit.

Argued March 10, 1980.

Decided June 19, 1980.

A. Santiago Villalonga, Hato Rey, P. R., with whom Hartzell, Ydrach, Mellado, Santiago & Perez, Hato Rey, P. R., was on brief, for Rovira Biscuit Corp.

Herman W. Colberg, San Juan, P. R., with whom Reichard & Colberg, San Juan, P. R., was on brief, for Keebler Co.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, WYZANSKI, Senior District Judge.[*]

COFFIN, Chief Judge.

These cross-appeals arise out of a dispute between Keebler Company, a Delaware corporation having its principal place of business in Illinois, and Rovira Biscuit Corporation, a Puerto Rico corporation, over Rovira's use of the name "Export Sodas" to identify the soda crackers it sells in competition with Keebler.

#### Background of the Case

Sometime between the beginning of this century and the First World War, various companies in the United States began exporting a type of flat, square soda cracker to Puerto Rico. During the 1920's, at least one of these companies, National Biscuit, identified its product with a label bearing the term "Export Sodas". During this period, a Puerto Rican bakery was also manufacturing this type of cracker and advertising it under the name "Sport Sodas". Around 1929, one Mr. Rovira, father of the current chairman of the board of Rovira Biscuit, began manufacturing and selling soda crackers in Puerto Rico in a package with a label imitating a Catalonian coat-of-arms. On top of the container was a sticker containing the words "export sodas". Rovira continued to use this labeling until 1947 or 1948.

In 1934 or 1935, Keebler introduced a soda cracker into the Puerto Rican market under the name "Export Soda". These crackers were packaged in a green cylindrical can, which Keebler has used continuously since the mid-1930's in merchandising its crackers. Since 1951, Keebler has also sold its "Export Sodas", similarly packaged, in New York and other United States markets with large Puerto Rican populations. Because the other companies selling soda crackers in Puerto Rico had ceased using the term "export sodas" to label their products by the late-1940's, Keebler apparently made exclusive use of the term as an element of its package design and label from that time until 1974, when Rovira began selling its own brand of soda crackers labeled "Export Sodas" in the Puerto Rican and New York markets.

In February of 1975, Keebler filed an application with the United States Patent Office to register the term "Export Sodas" as a trademark. The patent office examiner refused registration, however, on the ground that the mark was "merely descrip-

* Of the District of Massachusetts, sitting by designation.

tive" and therefore not registrable under section 2(e) of the Lanham Act, 15 U.S.C. § 1052(e). Keebler amended its application, supplemented it with an affidavit stating that the mark had become distinctive through continuous and exclusive use for five years prior to the application, and re-submitted it to the patent office. The patent office granted Keebler registration of the term "Export Sodas" as its trademark on April 20, 1976.

After obtaining registration of "Export Sodas" as its trademark, Keebler filed an amended complaint[1] in the United States District Court charging Rovira with infringement of its trademark rights, seeking both damages and a permanent injunction against future use of the mark "Export Sodas" by Rovira. Keebler's amended complaint also charged that Rovira's use of a cylindrical lithographed can to package its product constituted unfair competition and requested a permanent injunction against Rovira's use of any "colorable imitation" of Keebler's packaging. Rovira, in addition to answering Keebler's complaint, filed a counterclaim alleging that Keebler's registration of the trademark "Export Sodas" was invalid because the mark is a generic term, a common descriptive phrase for soda crackers in the Puerto Rican market. Rovira requested cancellation of Keebler's trademark registration and an award of damages resulting from Keebler's "unlawful" appropriation of the term.

The district court found that before Keebler had begun using "Export Sodas" as a trademark, the terms "export sodas" and "sport sodas" had come to mean in the minds of Puerto Rican consumers soda crackers of this particular type. The court concluded, as a matter of law, that "export soda" was a generic term, not entitled to appropriation as a trademark, and therefore ordered cancellation of Keebler's registration. Although it concluded that Keebler

had no right to the exclusive use of the term "export sodas" as a trademark, the court did find that Keebler had established a period of exclusive use of a cylindrical lithographed container and that Rovira's use of a container of identical size and shape gave rise to consumer confusion. The court thus concluded that Keebler had a protectible interest in this form of packaging and enjoined Rovira from using containers of such size and shape to package its "Export Soda" crackers.

## The Applicable Law

The threshold issue facing us in this appeal, one addressed by neither the parties nor the district court, is the law applicable to Keebler's generalized complaint against Rovira. Keebler's amended complaint alleged merely the infringement of its trademark rights and appropriation of its goodwill through use of similar packaging. Although the Lanham Act, 15 U.S.C. §§ 1051–1127, provides a specific grant of federal jurisdiction for claims of infringement of federally registered trademarks, 15 U.S.C. § 1121, Keebler invoked the jurisdiction of the district court solely on the basis of diversity of citizenship.

The law to be applied in the federal courts, whether jurisdiction is premised on the presence of a federal question or on diversity, is that law that is the source of the right sued upon.[2] *See First Southern Federal Savings & Loan Ass'n v. First Southern Savings & Loan Ass'n.*, 614 F.2d 71 (5th Cir. 1980); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540–41 n. 1 (2d Cir. 1956). The doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1939), is inapplicable to claims created and governed by federal law, even though jurisdiction rests on diversity of citizenship. *See Sola Electric Co. v. Jefferson Electric Co.*, 317 U.S.

1. Keebler filed its original complaint on April 25, 1975, shortly after its initial application for federal registration of its trademark.

2. Keebler's failure to invoke the substantive provisions of the Lanham Act in its complaint does not determine the law on which this case

is to be decided. A federal court is bound by applicable federal law, whether or not it is explicitly pleaded. *See Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 546 (2d Cir. 1956) (Clark, C. J., concurring).

173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942); Hart & Wechsler's The Federal Courts and the Federal System 766–67 (1973). Keebler has sued for infringement of its federally registered trademark, and section 32 of the Lanham Act, 15 U.S.C. § 1114, specifically grants a right to protect, by means of a suit for injunctive and monetary relief, a registrant's proprietary interest in such a mark. Thus, to the extent Keebler has a valid registered trademark, federal law determines its rights therein. *Dwinell-Wright Co. v. National Fruit Product Co.*, 140 F.2d 618, 620 (1st Cir. 1944); *see Mendes v. New England Duplicating Co.*, 94 F.Supp. 558, 560 (D.Mass.1950). *But see Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 796–97 (3d Cir.), *cert. denied*, 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949).

 Determining the validity and scope of Keebler's federal registration does not end the matter, however, for registration does not create the underlying right in a trademark. That right, which accrues from the use of a particular name or symbol, is essentially a common law property right, *Campbell Soup Co. v. Armour & Co.*, *supra*, 175 F.2d at 797, and cancellation cannot extinguish a right that federal registration did not confer.[3] Thus, Keebler's complaint, liberally construed, also stated a cause of action under the head of common law unfair competition, the broad class of business torts of which trademark infringement is one species. There has been considerable debate over whether a federal court faced with such an issue should apply relevant state common law or the specialized federal common law of trademarks and

unfair competition developed prior to the Supreme Court's decision in *Erie*.[4] We need not resolve that question in this case, however, since the trademark and unfair competition law of both Puerto Rico and New York is congruous with the common law principles developed by the federal courts. *See Maternally Yours, Inc. v. Your Maternity Shop, Inc., supra*, 234 F.2d at 545 (Clark, C. J., concurring) (no difference in result reached by deciding cases under New York or federal law); *Cooperativa de Cafeteros v. Colon Colon*, 91 P.R.R. 361 (1964) (incorporating principles enunciated by federal cases).

 Finally, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a federal law of unfair competition by providing a statutory remedy to a party aggrieved by a competitor's "false designation of origin" of his product, even though he does not have a federally registered trademark. *See, e. g., Deyerle v. Wright Manufacturing Co.*, 496 F.2d 45 (6th Cir. 1974). This provision has been broadly construed to encompass instances of one competitor "palming off" his goods as those of another by means of confusing packaging or labeling of his product. *See, e. g., Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Manufacturing Co.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Federal Mogul Bower Bearings, Inc. v. Azoff*, 313 F.2d 405 (6th Cir. 1963); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3rd Cir. 1954). The protection afforded by section 43(a) was designed to expand the rights of a "purely commercial class" against the un-

---

3. The Lanham Act does not preempt the states' ability to recognize and protect trademark rights. The purpose of the Act was to protect the public from confusing and deceptive trademarks and to provide security against misappropriation for trademark owners who have invested resources in presenting their products to the public and exploiting whatever goodwill the merits of their products warrant. *See Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975). The Supremacy Clause bars only state statutes or doctrine that would permit the sort of confusing or deceptive practices the draftsmen of the Lanham Act sought to prevent.

4. *Compare, e. g., Maternally Yours, Inc. v. Your Maternity Shop, Inc., supra*, 234 F.2d at 540 n. 1; *National Fruit Product Co. v. Dwinell-Wright Co.*, 47 F.Supp. 499 (D.Mass.1942) (state law applies), *with* Zlinkoff, *Erie v. Tompkins: In Relation to the Law of Federal Trademarks and Unfair Competition*, 42 Colum.L. Rev. 955 (1942) (national character of commercial activity requires uniform body of federal law). *See generally* E. Kitch & H. Perlman, *Legal Regulation of the Competitive Process* 41–46 (1972).

scrupulous practices of their business competitors. *Alfred Dunhill, Ltd. v. Interstate Cigar Corp.*, 499 F.2d 232, 236–37 (2d Cir. 1974). It is cumulative of, and does not preempt, the broader consumer-oriented remedies provided by the common law of unfair competition. And because this section created a new federal statutory tort, pre-Lanham Act decisions based on the federal common law of unfair competition, while suggestive, are not controlling.

With those principles in mind, we consider the merits of these cross-appeals.

## Keebler's "Export Sodas" Trademark

■ Section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a), provides that any registration issued under the Act "shall be prima facie evidence of registrant's exclusive right to use the registered mark in commerce." The Act also provides, however, two avenues of affirmative defense to a party charged with infringement of a registered mark. Section 33(a), in addition to stating the presumption of the registrant's right to exclusive use, provides that registration "shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered." And section 14, 15 U.S.C. § 1064, authorizes a party aggrieved by registration of a mark to bring a petition for cancellation of the registration. Such a petition may be brought either in a separate and independent action or as a counterclaim in an infringement suit.[5] *Sylvania Electric Products v. Dura Electric Lamp Co.*, 247 F.2d 730 (3rd Cir. 1957).

■ The effect of registration under the Lanham Act, therefore, is to shift the burden of proof from the plaintiff, who in a common law infringement action would have to establish his right to exclusive use, to the defendant, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such use. A defendant may satisfy this burden of proof with respect to the specific defect he alleges in plaintiff's registration by a preponderance of the evidence. *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 1013–14 (Cust. and Pat.App.1979); *Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399, 1403 (Cust. and Pat. App.1974).[6]

■ Rovira based its defense to infringement and its counterclaim challenging Keebler's registration upon an allegation that "export sodas" is a generic term and therefore is not entitled to protection as a trademark.[7] A generic term is one

---

5. Keebler notes in its brief that Rovira did not file any opposition to its application for registration of the trademark "Export Sodas". Failure to file such opposition does not, however, affect a party's right to petition for cancellation of a competitor's registration. *See Charles of the Ritz v. Elizabeth Arden Sales Corp.*, 161 F.2d 234, 34 CCPA 1029 (1947).

6. The Second Circuit, in *Aluminum Fabricating Co. v. Season-All Window Corp.*, 259 F.2d 314, 316 (2d Cir. 1958), stated that the "strong presumption of validity" created by Lanham Act registration requires the party attacking a registered mark to "put something more into the scales than the registrant." This statement reflects what was, until recently, the prevailing rule in the Court of Customs and Patent Appeals: that the presumption of validity of a registered mark could be overcome only by clear and convincing evidence. *See, e. g., W. D. Bryon & Sons, Inc. v. Stein Bros. Mfg. Co.*, 377 F.2d 1001, 54 CCPA 1142 (C.C.P.A.1967). The Court of Customs and Patent Appeals has since rejected this position, and we agree that

the better rule is to require only a preponderance of the evidence.

7. Keebler argues that Rovira should be estopped from asserting the genericness of the term "export sodas" because it attempted to register the term as its trademark under the Puerto Rico trademark statute, P.R. Laws Ann. tit. 10 §§ 191–192 (1978). According to Keebler, Rovira's filing of an application under the Puerto Rican Act, which was accompanied by a statement under oath that Rovira was entitled to appropriate the term as its trademark, was fatally inconsistent with its assertion in this case that "export sodas" is not a registrable mark. Keebler characterizes its argument as "not strictly a question of estoppel, but as a matter in the nature of a positive rule of procedure based on manifest justice and . . . considerations of orderliness, regularity, and expedition in litigation." Although Keebler cites two decisions that lend some support to its argument, *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir. 1962); *Union Tank Car Co. v. Lindsay Soft Water Corp.*, 257

that does not distinguish the goods of one producer from the goods of others. Instead, it is one that either by definition or through common use "has come to be understood as referring to the genus of which the particular product is a species."[8] *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). For example, "aspirin" is now a generic term for the common analgesic sold under various brand names. Section 14(c) of the Lanham Act, 15 U.S.C. § 1064(c), provides for cancellation of any mark that has become "the common descriptive name of an article or substance", *i. e.*, a generic term. No amount of purported proof that a generic term has acquired a secondary meaning as-

sociating it with a particular producer can transform that term into a registrable trademark. *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 9. Similarly, at common law terms that are generic are normally not subject to appropriation as trademarks, *see Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 116, 59 S.Ct. 109, 112, 83 L.Ed. 73 (1938); *Delaware & Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall.) 311, 323, 20 L.Ed. 581 (1872); *S. S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979), al-

F.Supp. 510 (D.Neb.1966), *aff'd*, 387 F.2d 477 (8th Cir. 1967), we nevertheless conclude that Rovira is not estopped from raising its affirmative defense to Keebler's infringement claim.

Under rule 8(e)(2) of the Federal Rules of Civil Procedure, a defendant may assert a counterclaim that is inconsistent with an affirmative defense that is raised by the same answer. *Polaroid Corp. v. Polorad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Under this liberal pleading rule, Rovira could have asserted simultaneously that "export sodas" is generic and that, assuming the mark is not generic, it was entitled to use the term as its trademark because it was a prior user in the Puerto Rican market. Similarly, rule 8(e)(2) permits a party to raise a defense that is inconsistent with a position taken under oath in a separate prior proceeding. *Parkinson v. California*, 233 F.2d 432, 438 (10th Cir. 1956). Thus, in the absence of any showing of bad faith, *see* Fed.R.Civ.P. 11, Rovira's affirmative defense of genericness was not barred by the federal rules, notwithstanding its seemingly inconsistent Puerto Rican trademark application. The liberality with which the federal rules treat inconsistent pleadings undercuts Keebler's generalized argument based upon judicial economy and procedural orderliness.

The remaining question is whether principles of equitable estoppel preclude Rovira from raising this defense. *See Parkinson v. California, supra*. An essential element of a claim of equitable estoppel, however, is that the party raising the claim be prejudiced by the opposing party's inconsistency. Thus, had Rovira gained some benefit from an earlier recognition of Keebler's trademark—for example, by acknowledging the validity of the trademark in a licensing agreement as in *Union Tank Car Co. v. Lindsay Soft Water Corp., supra* —or gained some competitive advantage *vis a vis* Keebler through its effort to secure local registration of

the mark, it might be estopped from later attacking the validity of Keebler's trademark by denying the registrability of the term. Here, however, Rovira was apparently attempting to protect itself by establishing some legal basis for its claim of a right to exclusive use of the term "export sodas" in the event it was a registrable mark. It is difficult for us to conceive how Keebler was prejudiced by such efforts on Rovira's part or how its conduct might have been altered to its benefit had Rovira not filed for registration under the Puerto Rican act. That Rovira's efforts to secure local registration would most likely have been fruitless in light of the Supremacy Clause adds nothing to Keebler's estoppel argument.

8. Both Lanham Act and common law cases differentiate four categories of terms for purposes of trademark analysis: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). A descriptive term merely describes a characteristic or ingredient of the article to which it refers. A descriptive term can become a trademark only if it has acquired a secondary meaning, so that the consumer associates the term with a particular producer's goods. A suggestive term suggests rather than describes the characteristics of the goods to which it is affixed. Such a term, which invokes the consumer's perceptive imagination, can be protected without proof of secondary meaning. Finally, an arbitrary term bears no logical or suggestive relation to the actual characteristics of the goods. Such a term is almost always protectible since, unlike a suggestive term, it is not vulnerable to attack for being merely descriptive. Even a fanciful term may, however, through usage become generic.

though a strong showing of secondary meaning may be sufficient to grant a right to exclusive use, *see American Aloe Corp. v. Aloe Creme Laboratories, Inc.*, 420 F.2d 1248 (7th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

 The district court's conclusion that "export sodas" is a generic term "as a matter of law" followed from its finding, based on its assessment of both testimonial and documentary evidence, that the term is the common descriptive name of this type of cracker in the Puerto Rican market. We are not free to reverse this factual finding unless we conclude, after reviewing the evidence in the record, that the district court was clearly erroneous. Fed.R.Civ.P. 52(a).

 The term "export soda", as it was initially used before 1925, is best characterized as merely descriptive of the product it referred to. *See* note 8, *supra*. It was applied to soda crackers that were manufactured in the United States and exported to Puerto Rico—hence, "export" sodas. The district court noted, however, that before Keebler began selling its "Export Sodas", Rovira had used the term in labeling its domestically manufactured soda crackers, a use obviously not merely descriptive of the nature of the product. Moreover, the court found that during the 1920's another domestic producer of soda crackers, one Juan Bigas Moulins, was selling and advertising soda crackers of this type under the name "Sport Sodas". Finally, the court observed that the pronunciations of the terms "export sodas" and "sport sodas" in Spanish—phonetically, "eh-por-sodas"—are basically indistinguishable. From this, the court concluded that in the 1920's this type of soda cracker "had acquired a particular name to which the Puerto Rican referred when speaking of said type of crackers", and that the Spanish homonyms "export soda" and "sport soda" were also synonyms to the Puerto Rican public. Although there is some contradictory testimony regarding the dates on which various companies commenced and ceased using these terms, we do not find the court's conclusion to be clearly erroneous. Our review of the testimony of

certain witnesses whose memory extends back to this era reveals support for the court's finding that the term "export soda" was generic before Keebler introduced its soda cracker into this market.

The district court further found that despite Keebler's subsequent extended period of use of the term "export sodas" in packaging and labeling its crackers, the term remained generic in the Puerto Rican market. The court stated:

"The term 'export soda' has been used in Puerto Rico, at least since the 1950's, to name the type of soda cracker produced by the parties hereto regardless of the brand. Such is the common usage of the term today and so has been for over twenty years in Puerto Rico."

The court's support for this conclusion was chiefly indirect. It cited numerous price regulations published during the 1970's by the Consumers Affairs Administration and the Department of Education of Puerto Rico referring to "export sodas" as a class of goods and establishing maximum prices for "different brands of export soda crackers." The court also noted that around 1950 Rovira employed a radio advertising jingle that included the line "the Rovira biscuits, the 'eh-por-soda' that you like the best."

 Keebler argues that such evidence is insufficient to support a finding of genericness in the absence of some direct evidence that consumers regard the term as the common descriptive name for these soda crackers. While we agree that evidence such as a consumer survey would be desirable in a case such as this, *see, e. g., King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963), indirect evidence can establish the genericness of a mark, *see Dan Robbins & Associates, Inc. v. Questor Corp.*, *supra*, 599 F.2d at 1014 (citing listings in trade journals, newspapers, and other publications as useful evidence); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, *supra*, 537 F.2d at 12 (relying on advertisements to establish genericness of term). More significantly, Keebler ignores the generally prevailing view that a mark once

generic, as we have found that the term "export sodas" was prior to Keebler's entry into the market, cannot become registrable even though one party has enjoyed a period of exclusive use of the mark. *See Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*, 290 F.2d 845, 848, 48 CCPA 1004 (1961). We conclude, therefore, that it was not error for the district court to conclude that "export sodas" is a non-registrable generic term in the Puerto Rican market.

 Keebler argues further that the district court erred as a matter of law in ordering cancellation of its registration throughout the United States because both Rovira's proof and the district court's findings of fact were limited to the Puerto Rican market. It is possible for a term to be generic in one market but not in another. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 10. A party attacking federal registration on the ground that the mark has become generic as a result of common usage and understanding thus has the burden of proving the scope of such common usage. It was incumbent on the district court to determine whether "export sodas" has attained generic meaning in New York and the other United States markets in which Keebler sells soda crackers under this name. Although the court cited some evidence of use of the term in the United States, its finding of genericness referred only to the Puerto Rican market. We therefore remand the case to the district court to determine whether the term "export sodas" is also a generic term in the United States markets in which Keebler seeks to preserve its right to exclusive use.

 Since we agree that the district court properly cancelled Keebler's federal registration, at least in the Puerto Rican market, Keebler is without the benefit of the presumption of its right to exclusive use of the term "export sodas". The burden of proof, therefore, was on Keebler to prove that it was entitled to common law trade-

mark protection. Although in some cases of cancellation of federal registration the registrant may still be able to establish his common law right to exclusive use, where federal registration has been cancelled because the mark is found to be generic, it is almost impossible to establish the secondary meaning required for common law trademark protection. *See, e. g., S. S. Kresge Co. v. United Factory Outlet, Inc., supra*, 598 F.2d at 696–97; *American Aloe Corp. v. Aloe Creme Laboratories, Inc., supra*, 420 F.2d at 1252. Keebler was required to show that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co., supra*, 305 U.S. at 118, 59 S.Ct. at 113; *see Cooperativa Cafeteros v. Colon Colon, supra*, 91 P.R.R. at 376. Similarly, to prevail under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Keebler needed to establish that the mark it seeks to protect has become "so associated with its goods that the use of the [mark] by another company constitutes a representation that its goods come from the same source." *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144 (2d Cir. 1956). Although the district court did not explicitly address the elements of common law trademark infringement or false designation of origin, the court's finding that the term "export sodas" is used and understood by Puerto Rican merchants and consumers to mean a particular type of cracker and not a particular producer forecloses any possibility of Keebler establishing a right to exclusive use in Puerto Rico on the basis of secondary meaning.[9]

## Keebler's Package Design

Keebler sells its export soda crackers in a bright green cylindrical can eight inches high and seven inches in diameter. This can bears the mark "Export Sodas" in three-quarter inch yellow stencil-type capital letters. Above the name is Keebler's logo, a five-sided red crest containing the

**9.** On remand, the court should determine whether, if the mark is also generic in Keebler's United States markets, the term has attained

sufficient secondary meaning to justify common law trademark protection in those markets.

word "Keebler" in white, superimposed on an abstract depiction of a tree. Arranged roughly in a semi-circle around the name "Export Sodas" are photographic representations of nine soda crackers. Rovira packages its crackers in a can of identical size and shape. In contrast to Keebler's container, however, Rovira's can is a bright metallic blue, and the name "Export Sodas", although a similar shade of yellow, is printed in plain block one-and-one-quarter inch lower case letters. To the left of the name are three soda crackers of approximately the same size as those on Keebler's label. To the right of the name is Rovira's logo, a round red field on which the words "Rovira Biscuits" are printed in white.

The district court enjoined Rovira from selling or advertising its crackers in containers of this configuration, or any colorable imitation thereof. The court based this order on its factual finding that Keebler had made continuous use of such a container for its crackers for almost forty years, and exclusive use for "several years", and that the similarity of the shape, size and design of Rovira's container "gives way to substantial confusion." In determining that Rovira's can "gives rise to consumer confusion", the court apparently relied solely on inferences drawn from its own examination of the two containers; it recited no evidence of actual consumer confusion or any extrinsic evidence that such confusion was likely to occur.

■■■■ Rovira argues that because the court's finding of likelihood of confusion was not based on any testimony or documentary evidence, we should not apply the "clearly erroneous" rule, Fed.R.Civ.P. 52(a), in reviewing that finding. Our repeated holdings that factual determinations made solely on the basis of documentary evidence are reversible only if clearly erroneous, see, e. g., Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 576 (1st Cir. 1980); Leach v. Crucible Center Co., 388 F.2d 176, 179 (1st Cir. 1968), apply equally strongly, however, where the court's inferences are drawn from its examination of real evidence. Furthermore, although several

courts have adopted the position that the nature of the determination of likelihood of confusion makes it a question of law, see, e. g., Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440 (9th Cir. 1980); Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 152 & n. 1 (9th Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963) (collecting cases), we think the finding of the court in this case quite clearly called upon the court's "experience with the mainsprings of human conduct", Commissioner v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960), and therefore is reversible only if clearly erroneous.

Even under this more generous standard of review, however, we cannot accept the district court's finding of likelihood of confusion. At trial, Keebler introduced no evidence of actual consumer confusion engendered by Rovira's use of its blue can. Keebler quite correctly notes that when a suit for injunctive relief from a competitor's use of a deceptively similar mark or package is brought at the incipiency of the alleged infringement, "[p]laintiff should not be expected to stand by and await the dismal proof." DeCosta v. CBS, Inc., 520 F.2d 499, 514 (1st Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976). But Keebler fails to advert to the converse rule set out in DeCosta : "[A]fter the lapse of substantial time if no one appears to have been actually deceived that fact is strongly probative of the defense that there is no likelihood of deception. . . ." Id., quoting 3 Callman, Unfair Competition, Trademarks and Monopolies § 80.6 at 562 (3d ed. 1969).

■■■ The facts of this case belie Keebler's assertion that it should not have been required to show proof of actual consumer confusion. Rovira began using its cylindrical container "early in 1974". Keebler did not file its amended complaint until June of 1976, however, and the case was not tried until September of 1977, over three and one-half years after Rovira commenced the use Keebler sought to enjoin. There is an additional reason for requiring proof of ac-

tual confusion in this case: the containers themselves. The striking difference in the predominant colors of the two cans makes it seem highly unlikely that a reasonably prudent consumer would confuse one product for the other. This combination of factors—the elapsed time between Rovira's first use and the trial, and the substantial difference between the two containers—leads us to conclude that it was clearly erroneous for the district court to find that Rovira's trade dress "gives rise to consumer confusion" without some evidence in the record to support this finding. *See DeCosta v. CBS, Inc., supra*, 520 F.2d at 514–15.[10]

■■■ Even if we were to agree that there was sufficient likelihood that consumers could as easily buy either of the two products, we do not believe that Keebler made out a claim for either common law unfair competition or "false designation of origin" under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). An element essential to common law unfair competition is that the features of a competitor's trade dress that plaintiff asserts are unfairly imitative have acquired a secondary significance, so that the public associates those features with the plaintiff. *Kellogg Co. v. National Biscuit Co., supra; Cooperativa Cafeteros v. Colon Colon, supra*. Similarly, the essence of a claim under section 43(a) of the Lanham Act is that a competitor's packaging or labeling deceives purchasers as to the source of its goods; *i. e.*, that consumers buy the competitor's product thinking it to be that of the plaintiff. *Joshua Meier Co. v. Albany Novelty Mfg. Co., supra*, 236 F.2d at 147; *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1294 (S.D.N.Y.1972).

■■■ It is not sufficient for Keebler's claim that Rovira's use of a similar cylindrical can with the name "Export Sodas" affixed will harm Keebler's business. As we have held above, Keebler has no right to the exclusive use of the term "export sodas", at least not in the Puerto Rican market. Nor is there sufficient evidence in the record to support the court's finding that Keebler

had any right to exclusive use of a can of this particular size and shape. Functional, as opposed to arbitrary or merely decorative, shapes are not subject to appropriation by one manufacturer. *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1216–18 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *cf. Application of Mogen David Wine Corp.*, 372 F.2d 539, 54 CCPA 1086 (C.C.P.A.1967) (finding that peculiarly shaped wine bottle did not, in and of itself, serve as indication of origin of trademark applicant's product). There can be little doubt that Keebler's can is a functional design. Absent proof of secondary meaning more substantial than "exclusive use for several years", Keebler cannot prevail in asserting that its prosaic cylindrical shape had acquired a secondary meaning. Were this not our holding, the first user of a container such as the now-standard soup can, potato chip bag, or cracker box would be able to preclude competitors from using these highly functional containers.

■■ Finally, we note that Keebler's complaint alleged that Rovira has traded on its goodwill. In light of our foregoing conclusions, language from the Supreme Court's decision in *Kellogg Co. v. National Biscuit Co., supra*, 305 U.S. at 122, 59 S.Ct. at 115, is particularly apt:

"Kellogg Company is undoubtedly sharing in the goodwill of the article known as 'Shredded Wheat'; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that is not unfair. Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested."

So long as Rovira has taken reasonable steps to distinguish its product, which we find it has by adopting a differently colored

---

10. In *DeCosta* we held the findings of the district court to be clearly erroneous even though

there was some testimonial evidence of actual confusion.

and decorated can and by prominently displaying its logo, it has not infringed any proprietary right for which Keebler is entitled to protection. We conclude, therefore, that the district court's order enjoining Rovira's use of its cylindrical can must be reversed.[11]

*Affirmed in part; reversed in part; and remanded for proceedings consistent with this opinion.*

11. Of course, if on remand the court concludes that "Export Sodas" is still entitled to trademark protection in Keebler's United States markets, Rovira will be barred from using a can with that mark affixed in those markets.