THIS DISPOSITION IS
CITABLE AS
PRECEDENT OF THE
TTAB

Mailed:
December 15, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re International Business Machines Corporation[1]

_____

Serial No. 75581859

_____

Ethan Horwitz of Goodwin Procter LLP for International
Business Machines Corporation.

Tarah Hardy Ludlow, Trademark Examining Attorney, Law
Office 110 (Chris A. F. Pedersen, Managing Attorney).

_____

Before Quinn, Drost and Zervas, Administrative Trademark
Judges.

Opinion by Zervas, Administrative Trademark Judge:

International Business Machines Corporation ("IBM"),

by assignment from Technauts, Inc. ("Technauts"), is the

owner of an application to register on the Supplemental

Register the term ESERVER (in typed or standard character

form) for goods ultimately identified as "computer network

---

[1] The Assignment Division of the U.S. Patent and Trademark Office
has recorded an assignment of the application which is the
subject of this proceeding from the original applicant,
Technauts, Inc., to International Business Machines Corporation
at Reel No. 2489, Frame No. 8518.

access products, namely, computer hardware and operating software therefor that allow connectivity to and the administration of public and proprietary computer networks and the processing of information contained thereon" in International Class 9.[2]

The application was originally filed on the Principal Register, at which time the examining attorney refused registration on the ground that the term ESERVER is merely descriptive of applicant's goods. 15 U.S.C. § 1052(e)(1). After the examining attorney issued a final refusal on the ground that the mark is descriptive of the goods, Technauts filed a notice of appeal. Subsequently, Technauts assigned the application to IBM, and IBM as applicant sought reconsideration and amended the application to seek registration under Section 2(f) of the Trademark Act, 15 U.S.C. §1052(f), claiming that ESERVER had acquired distinctiveness. The examining attorney found applicant's evidence of acquired distinctiveness to be insufficient and, in its response filed February 8, 2005, applicant amended its application to seek registration on the Supplemental Register. The examining attorney then refused

---

[2] Application Serial No. 75581859, filed November 4, 1998, claiming first use anywhere and first use in commerce in March 1998.

registration pursuant to Section 23(c) of the Trademark Act, 15 U.S.C. § 1091(c), on the ground that the term is generic for the goods, and therefore incapable of distinguishing applicant's goods. After the examining attorney issued a final Office action under Section 23(c), applicant then continued the appeal to the Board. Both applicant and the examining attorney have filed briefs concerning the Section 23(c) refusal.

The examining attorney argues that the "plain meaning of the wording used in the identification shows that servers are the class of goods at issue"; and that the mark is a combination of the prefix "e" and the generic term SERVER. Brief at unnumbered p. 5. According to the examining attorney, SERVER "primarily refer[s] to a key feature of the class or genus of the goods at issue in this case, namely, computer hardware and operating software"; "the 'e' prefix has become commonly recognized as a designation for goods or services that are electronic in nature or are sold or provided electronically"; and that "when the 'e' prefix is combined with a generic term, the mark is found to be generic", citing, inter alia, the Board's decision in *Continental Airlines Inc. v. United Air Lines Inc.*, 53 USPQ2d 1385 (TTAB 1999) (E-TICKET held generic for computerized reservation and ticketing of

3

transportation services.)  The examining attorney adds that "both the prefix E and the term SERVER are generic of the goods"; and that "if the combination of two or more generic terms is such that each term retains its generic significance, then the combined expression is generic and thus incapable of denoting source," citing, inter alia, *In re Gould Paper Corp*. 834 F.2d 1017, 5 USPQ2d 1110 (Fed. Cir. 1987).  Brief at unnumbered p. 5.

Applicant maintains that ESERVER is not generic; that the burden is on the examining attorney to show that ESERVER is generic by clear evidence of generic use; that "any and all of the Examining Attorney's references to the mark ESERVER reveal use of this mark by Applicant and Applicant's predecessor in interest"; and that the "evidence introduced by the Examining Attorney, which includes articles and citations referring separately to the term 'SERVER' and to the prefix 'e-' (notably with the hyphen), with a few references identifying the term 'e-server,' does not illustrate how the public perceives Applicant's mark ESERVER."  Brief at p. 3.

The Court of Appeals for the Federal Circuit, our primary reviewing court, has held that "[t]he critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought

4

to be protected to refer to the genus of goods or services in question." *H. Marvin Ginn Corp. v. Int'l Association of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). *Ginn* explains that:

> Determining whether a mark is generic … involves a two-step inquiry:  First, what is the genus of goods or services at issue?  Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?

*Id*.  The Office bears the burden of establishing genericness based on clear evidence of generic use.  *In re American Fertility Society*, 188 F.3d 1341, 51 USPQ2d 1832, 1835 (Fed. Cir. 1999).

Turning to the first *Ginn* factor, i.e., the genus of goods, the examining attorney has demonstrated that the genus of goods in this case is "servers."  She has introduced into the record the following definitions of "server," with her final Office action on genericness:

> computer or computer program which manages access to a centralized resource or service in a network (*Compact Oxford English Dictionary*, www.askoxford.com); and

> computer in a network that is used to provide services (as access to files or shared peripherals or the routing of e-mail) to other computers in the network (*Merriam-Webster Online*, www.m-w.com).

5

Based on these definitions and applicant's identification of goods, we are persuaded that the term "server" describes the genus of the goods. We note too that applicant has not suggested another genus of goods.

Next, we consider whether the term "eserver" is understood by the relevant public primarily to refer to that genus of goods. *Ginn*, 228 USPQ at 530. "Evidence of the public's understanding of the term may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications." *In re Merrill Lynch, Pierce, Fenner and Smith Inc*., 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987). "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Ginn*, 228 USPQ at 530. In this case, the relevant public consists of those involved in the design, operation and purchase of computer networks and information technology specialists.

The evidence of record in this case, which has been pending for approximately eight years and in which the examining attorney issued numerous Office actions and applicant filed numerous responses, is significant in

6

quantity. Because the examining attorney has stated on p. 2 of her final Office action on genericness that she "incorporates the evidence included in the prior office actions," we consider all of the evidence of record submitted by the examining attorney, even the evidence submitted in support of her descriptiveness refusals.[3] Of course, we also consider the evidence submitted by applicant.

The examining attorney maintains that ESERVER is a combination of the generic prefix "e" and the generic term SERVER. Brief at unnumbered pp. 5 and 7. She has established through definitions submitted with her Office actions that "e-" is a "prefix that stands for 'electronic' and refers to information technologies, business, and almost anything connected to or transmitted over the Internet [and] [s]ome examples of its use include e-business, e-commerce, e-book, and e-mail." *The New Dictionary of Cultural Literacy* (3d ed. 2002), located on

---

[3] Some of this evidence has limited probative value. The listing of search results from the Google database for "server" showing "about 104,000,000" results, and for "eserver" showing "about 2,030,000" results, is of limited probative value because the excerpts that appear in the Google listing are extremely truncated with brief bits of text, and we do not have the web pages themselves from which to examine the context within which the search terms are used. Evidence of use of a term or phrase in headings or content on individual web sites has far greater probative value. See *In re Fitch IBCA Inc.*, 64 USPQ2d 1058 (TTAB 2002).

*www.bartleby.com* and made of record with the March 3, 2005 Office action.  See also definition of "e-" from www.encarta.msn.com made of record with the September 19, 2005 Office action; "1.  electronic ·*e-mail*[,] 2.  electronic data transfer via the Internet ·*e-commerce*." We find that in the context of applicant's identified goods, which fall within the definition of a "server," and in light of the term SERVER in applicant's mark, the "E" in ESERVER would be perceived as a prefix standing for "electronic," and identify a server involved with the Internet.  See *Continental Airlines*, 53 USPQ2d at 1397 ("'E-ticket' is an abbreviated form of 'electronic ticketing'"); *In re Styleclick.com Inc*., 57 USPQ2d 1445, 1448 (TTAB 2000) ("E" is a prefix that is generally recognized as meaning "electronic" in connection with computers and the Internet).  In so finding, we reject applicant's suggestion that there is a difference between "e-server" with a hyphen and "eserver" without a hyphen - we see no difference in the meaning or connotation of "e-server" and "eserver," and consider them both to be an abbreviated form of "electronic server."  See, e.g., the single dictionary entry in *The American Heritage Dictionary*

8

*of the English Language* (4th ed. 2000) for both "email" and

"e-mail," of which we take judicial notice.[4]

The examining attorney has located web sites that use

"electronic server" in the context of the Internet:

> *www.springeronline.com*
> Pre-press: the right to retain a pre-press
> version of the article on a public **electronic
> server** such as the World Wide Web.
>
> *www.thieme.com*
> Thank you for your interest in thieme-
> connect.com, the **electronic server** for Thieme's
> scientific journals.
>
> *www.phschool.com*
> *The End of Good Science?* by Jessica Gorman
> Anyone can post research to an **electronic server**,
> whether or not the work is any good.
>
> www.geocities.com
> The following is an article from a past issue of
> the American Way – from American Airlines (since
> pulled from their **electronic server**).

From the foregoing, it appears that an "electronic server"

is another term for a server used for placing information

on the Internet.

We next consider whether the evidence of record shows

that "eserver" or "e-server" is a recognized term for the

goods.

---

[4] The Board may take judicial notice of dictionary definitions. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.*, 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

The *www.realtystar.com* web page, made of record with

the August 16, 2004 Office action, characterizes an "e-

server" as an "Internet Server":  "eAGENT™ server is an

Internet Server (e-server) solution for running the

following software products online."  Further, the web page

from *www.industrialnewsroom.com*, made of record with the

August 16, 2004 Office action,[5] uses both "e-server" and

"server" to refer to one product and specifies that the

product has Internet applications:

> Broadax Systems, Inc. today introduced their
> latest high performance **e-server**, the RMS-6260.
> This new powerful mid-range server series
> combines six hot-swappable RAID5 compatible
> drives and dual redundant, hot-swappable power
> supplies with the reliable operation of dual
> Intel ® Pentium ® III 1.4 GHz Tualatin
> processors, 4 GB SDRAM memory, dual ATA-100 IDE
> channels, dual fast Ethernet LANs, five 64-bit/33
> MHz full-size PCI cards.  The system supports a
> variety of operating systems and is optimized for
> both local and remote monitoring and restart
> making the RMS-6260 ideal for the most demanding
> server applications including online banking, e-
> trading, e-business, LAN and WAN servers and
> other extreme applications where downtime is not
> acceptable.

Similarly, the web page from *www.isp-planet.com* uses both

"e-server" and "server" in reference to the Broadax Systems

RMS-6260 "for the most demanding server applications

---

[5] The same article appears in *www.news.managingautomation.com*, made of record by the examining attorney with her September 19, 2005 Office action.

10

including online banking, e-trading, e-business," mentioned

in the preceding passage:

> Broadax Systems … introduced its high-performance **e-server**, the RMS-6260.  …  The company says that the RMS-6260 supports a variety of operating systems and is optimized for both local and remote monitoring and restart, which makes the RMS-6260 ideal for the most demanding server applications that can accept no downtime.   … The **e-server** uses 3.5-in. RAID Level 5 drives, which means that data is striped across three or more drives for greater data retrieval and writing speed and then by parity bits is [sic] stored on another separate drive to provide data security and fault tolerance.

Two different web pages discuss an Advantech product

and include references to "e-server[s]" which have features

suitable for "ISPs," i.e., Internet service providers:[6]

> *www.electronicstalk.com*
> Advantech has a high-speed processing, fast storage capacity **e-server**, the RS-100-RT series. This thin, and very compact **e-server** consists of a 1U compact, rack-mount design that offers flexible solutions suitable for ISPs, telecommunications, VOD and data centres.  …  In addition, the server can support RAID (0, 1, 5) and the third LAN without occupying any PCI slots and the 64 bit/66MHz PCI slot enables support of a proprietary two-port Gigabit LAN card without the need for a PCI bridge chip.
>
> *www.engineeringtalk.com*
> The RS-400 SF is a high-speed-processing fast-storage-capacity 4U rack-mount **e-server**.  … Advantech has equipped the **e-server** with it's [sic] own in-house designed, high-performance

---

[6] "ISP" is defined in *The American Heritage Dictionary of the English Language* (2003) as "Internet service provider."  We take judicial notice of this definition.

motherboard which supports high-speed Intel
Pentium 1, up to 2.1 GHZ …."

An article entitled *Achieving Maximal Value From Digital Technologies in Scholarly Communication* by Charles E. Phelps from *www.arl.org*, made of record with the September 19, 2005 Office action, uses "e-server" interchangeably with "electronic server" in the context of discussing the posting of manuscripts on the Internet:

> The easiest and lowest costing one is for authors of manuscripts to post their work (in a locked and electronically certified version) on their own web site, so that the editorial Board doing the certification can produce a virtual journal by simply posting a table of contents with links to the appropriate web sites. … A more complete process would link an **e-server** to the system, providing systematic oversight of the electronic source of the material, much as the Los Alamos server now does for the community of high energy physics. If **e-servers** and editorial boards are matched one-to-one, this simply becomes a system of e-journals. However, if a common site for the servers can be established to service a wide array of editorial boards, then the process of entering into the editorial fray is simplified. Thus, parallel development of mechanisms to support independent editorial boards and to provide **e-server** capabilities for distribution and archiving may be important.
>
> Several paths for providing this electronic "server" access seem feasible.

We also note the following Nexis excerpt, submitted by the examining attorney with her first Office action.

12

Ser. No. 75581859

> *America's Network*
> February 15, 1999
> … provide trading partners access that is
> surprisingly secure, yet accessible via
> ubiquitous Web browser technology.  There are
> commercially available **e- servers** that employ
> both "pull" (HTML) as well as broadcast (e.g.,
> PointCast) technologies.

The web pages and Nexis excerpt addressed in the

preceding paragraphs discuss an "e-server" in the context

of the Internet.  In the next few paragraphs, we identify

those Nexis excerpts and web pages of record that refer to

an "e-server" as the name of a product, but are silent as

to whether the "e-server" discussed has Internet

applications.

A Nexis article submitted with the first Office action

discusses an "e-server" in Los Alamos:

> *Information Technology & Libraries*
> American Library Association 1998
> December 1998
> … richness and reach it surpasses anything
> libraries can achieve.  Andres Odlyzko's analysis
> places the cost of the Los Alamos **e-server** at
> $ 75 per article, compared with $ 2,000 to
> $ 4,000 for a print journal.

Further, the examining attorney located the following in

the *www.esru.strath.ac.uk* website:[7]

---

[7] This web page is from a foreign source.  The Board has held
that it "is reasonable to assume that professionals in medicine,
engineering, computers, telecommunications and many other fields
are likely to utilize all available resources, regardless of
country of origin or medium.  Further, the Internet is a resource
that is widely available to these same professionals and to the
general public in the United States."  *In re Remacle*, 66 USPQ

13

1. Software overview

The software packages are installed and run within the Smarthomes system infrastructure. The packages are categorized into four components: Adam driver for e-box and PC, e-server, EnTrak service and Web service.

[The function of the Adam driver is as a] software driver to manage data transmission between sensors/actuators and the **e-server,** installed in the gateway system (i.e. an e-box or PC).

> **e-Server**
> This acts as a data router passing data between the e-boxes and EnTrak, which is installed on the server side of the OSGi platform.

With her January 30, 2004 Office action,[8] the examining attorney submitted several web pages.[9] One web page is from DDS Donovan Data Systems, Ltd. which identifies the "e-server Hours," i.e., the hours of operation of the "e-server." "E-server" is identified as a separate product category along with "Storage," "Power Supply" and

---

1222, 1224 n.5 (TTAB 2002). In this case involving computer technology, it is reasonable to consider a relevant article regarding computer hardware from an Internet web site, in English in another country.

[8] The examining attorney also submitted with the January 30, 2004 Office action a web page with the title "netproject" and the heading "IDA Open Source Migration Guidelines". As Exhibit E to such "Guidelines" is "Server Reference Software." The examining attorney has submitted this because of the subheading "E. Server Reference Software." Because the "E" is a reference to "Appendix E" and not the "e" in "eserver," this web page has no probative value.

[9] The web pages with the January 30, 2004 Office action do not include the web addresses of the web pages. As applicant has not objected to the introduction of these pages, we have considered them.

"Accessories" in another webpage entitled

"SUPERMICRO[illegible]," reproduced below:



Different servers with different configurations are displayed under the heading "E-Server System." They evidently are not applicant's servers - applicant has not claimed that the devices depicted in the web page are applicant's devices, and the model numbers for applicant's goods as described in the record are not listed on this web page.

The record also contains web sites and Nexis excerpts which refer to "e-servers" - from the context, however, we cannot determine whether the references to "e-servers" are to a type of server or specifically to applicant's servers.

15

For example, with her January 30, 2004 Office action, the examining attorney submitted a web page apparently from "Dedicated-Server-web.com" which promotes "E Server" for web hosting applications:

> **E Server**
> Full service dedicated server and server support for a low cost web server, e server, and great savings on all dedicated server …
> **Looking for a E Server?**
> **E Server**
> E Server and low cost dedicated server services are essential for every webmaster – You can trust us with the critical task of managing your dedicated server.  Dedicated Server offers managed servers, e server, and collocation services for enterprise level web hosting applications – We specialize in e server, and provide superior quality dedicated server services such as full-service collocation, dedicated server, and low cost affordable web hosting for small business – SAVE on all e server.
> **Sign Up Now for Dedicated Server Hosting**
> **E Server**

At the bottom of the page is the caption "web hosting, E Server, and hosting by Dedicated Server."

Similarly, the web pages from Samteck with the January 30, 2004 Office action bearing an email address of sales@samtecindia.com address the installation and configuration of "e-Server," which allows users to send and receive "mails using their favourite E-mail clients.  **e-Server** acts as a Mail Server for all the e-mail clients on the Users' desktops such as Microsoft Outlook, Outlook

16

express, Netscape Communicator, Eudora etc." Because the promotional material submitted by applicant regarding applicant's ESERVER product indicates that applicant's product performs similar services, it is possible that the reference to "e-Server" in Samteck's web site is a reference to applicant's goods.

In addition, the record contains references to "eServers" or "e-Servers" of four third parties. See the Nexis excerpt[10] from *Info World,* November 22, 1999, stating:

> Caldera also publicly showed its OpenLinux **e-Server** 2.3. … Caldera officials believe **e-Server** is best suited for hosting specific business logic and applications and system processes that must be carried over to the Internet.

See also, (i) the web page from "sierravideosystems," which depicts a "Crestron **E-server** Ethernet TCP/IP Web Control" and states, "The SVS/Crestron Web solution uses Crestron **E-server** technology and proprietary java based software to create a virtual environment for SVS switchers to be Internet appliances. The **E-server** appliance is similar to the above software but is able to run on any Windows or

---

[10] This excerpt was one of ten excerpts retrieved by the examining attorney from a search for "e server" on the Nexis database. Five of such excerpts are from newswires and four discuss applicant or applicant's predecessor in interest. Newswire stories do not have the same probative value as stories appearing in newspapers and magazines. *In re Cell Therapeutics Inc*., 67 USPQ2d 1795 (TTAB 2003).

Macintosh machine."; (ii) the web page submitted with the January 30, 2004 Office action which does not show a web address and states "Statit **e-Server** is a Software Development Kit (SDK) used to design quality improvement and statistical analysis solutions"; and (iii) the web page from *www.vei-systems.com stating,* "[t]he MARCI **E-Server** comes complete and ready to run with the packet data port on your F77 and includes domain registration and 1 (one) year email service. …  [T]he **E-Server** can provide a complete set of email accounts for everyone on Board." While "E-Server" may be used in each instance as the name of a product, it may also be used as part of a trademark by each of the four separate entities.

The evidence discussed above includes strong evidence from a variety of sources that "eserver" or "e-server" is a server with Internet applications.  As such, we find that an "eserver" is a category or sub-genus of a server. Although some of the examining attorney's evidence shows trademark use by applicant and possibly by third parties, and some of her evidence may actually be discussing applicant's ESERVER product, on the totality of the evidence submitted by the examining attorney, we find that she has established prima facie that members of the

relevant public primarily use or understand "eserver" to be a reference to this sub-genus of goods.

We now consider whether applicant has rebutted the examining attorney's prima facie case.  Once the USPTO sets forth a prima facie case, the burden shifts to the applicant to come forward with evidence to rebut the prima facie case with "competent evidence."  *See In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1010 (Fed. Cir. 1987); *In re R. M. Smith, Inc*., 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984); *In re Teledyne Indus., Inc*., 696 F.2d 986, 217 USPQ 9, 11 (Fed. Cir. 1982).

Applicant has argued in its brief that the examining attorney "has proffered little evidence to refute Applicant's claim [of acquired distinctiveness] or to otherwise demonstrate that the mark ESERVER is generic"; that "any and all of the Examining Attorney's references to the mark ESERVER reveal use of this mark by Applicant and Applicant's predecessor in interest"; and that "a few references identifying the term 'e-server,' does not illustrate how the public perceives Applicant's mark ESERVER."  Brief at p. 5.  It also argues that it has submitted "an abundance of evidence" showing "continued and exclusive use of the mark ESERVER and the public's

association of the same with Applicant and Applicant's goods." *Id*.

Applicant's challenge to the examining attorney's evidence is not persuasive. The examining attorney has provided clear evidence of generic use of the term "e-server" from several sources. Further, there are numerous references to "e-servers" in the examining attorney's evidence which without question are not referring to applicant's ESERVER product.

Additionally, the evidence submitted by applicant in support of its contention that the mark has acquired distinctiveness does not overcome the examining attorney's prima facie case.[11] Applicant submitted with its "Amendment Under Section 2(f)" the December 4, 2002 declaration of Ravi C. Periasamy, Technauts' President and Chief Executive Officer. Samples of communications with investors, customers and partners, advertising, press releases, reviews and presentations, as well as a printout of the Technauts website, are attached to Mr. Periasamy's declaration. Also, with its August 2, 2004 response,

---

[11] With the amendment of the application to the Supplemental Register, the question of acquired distinctiveness is no longer before us. However, because in determining whether a term is generic we must look to all the evidence of record, including evidence of acquired distinctiveness, we have considered the evidence for this purpose.

applicant provided additional evidence, including numerous articles which describe the ESERVER product, samples of advertising, and three declarations which address the asserted acquired distinctiveness of applicant's mark and applicant's use of ESERVER.[12]

Evidence of acquired distinctiveness cannot suffice to convert a generic term into a registrable mark. As the Board observed in *Continental Airlines*, 53 USPQ2d at 1395:

> Even if one has achieved de facto acquired distinctiveness in a generic term through promotion and advertising, the generic term is still not entitled to protection because to allow protection would "deprive competing manufacturers of the product of the right to call an article by its name." *America Online Inc. v. AT & T Corp.,* 51 USPQ2d 1865, 1873 (E.D. Va. 1999), citing *Abercrombie & Fitch,* 537 F.2d 4, 9, 189 USPQ 759 (2d Cir. 1976); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 143 at n.4, 43 USPQ2d 1734 (2d Cir. 1997); *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 374, 207 USPQ 465 (1st Cir. 1980) ("No amount of purported proof that a generic term has acquired secondary meaning associating it with a particular producer can transform that term into a registrable trademark"); *Reese Publishing v. Hampton International Communication,* 620 F.2d 7, 12 n.2, 205 USPQ 585 (2d Cir. 1980) (Evidence of secondary meaning "at most could have established 'de facto secondary meaning,' which cannot suffice to convert a generic term into a trademark"); *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.,* 601 F.2d 1011, 1014, 202 USPQ 401 (9th Cir. 1979) (A generic word "cannot be validly registered as a trademark

---

[12] The examining attorney has also submitted (i) web pages from applicant's web site; and (ii) web pages and Nexis excerpts which refer to Technauts and IBM by name in discussing the ESERVER product. This evidence does not show generic use of "eserver."

> even if there is proof of secondary meaning").
> *America Online Inc. v. AT & T Corp.,* 51 USPQ2d at
> 1873.

Evidence of generic use and proper trademark use by applicant does not necessarily create a mixed record that would overcome an examining attorney's evidence of genericness. It would be fairly easy for a well-heeled applicant to ensure that its web site and promotional materials, and even articles in the press regarding its products, properly use the applicant's mark. However, in this case, the significant evidence of generic use is not offset by applicant's evidence that shows proper trademark use by applicant and articles regarding applicant's servers.

Also, applicant contends that it has combined two separate terms and through this combination, its mark has added additional meaning to the terms, which enables ESERVER to be capable of identifying applicant's goods. Brief at p. 6. We are not persuaded by applicant's argument in light of the clear evidence of record showing "eserver" as a sub-genus of servers.

Decision: The refusal to register is affirmed.