**KARDEX SYSTEMS, INC., Plaintiff,**

v.

**SISTEMCO N.V. Remstar International, Inc., Kenneth W. Byers, Defendants.**

Civ. No. 83–0369 P.

United States District Court,
D. Maine.

March 23, 1984.

John A. Graustein, Portland, Me., Siegrun D. Kane, New York City, for plaintiff.

Thomas B. Wheatley, Portland, Me., James F. McKeown, Washington, D.C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER ON CROSS MOTIONS FOR PRELIMINARY INJUNCTION

GENE CARTER, District Judge.

### I. PROCEDURAL BACKGROUND

#### A. *Jurisdiction*

This is an action for infringement of registered and unregistered trademarks and for state law-based claims of unfair competition and false association. The latter cause of action is also based upon alleged violations of the Lanham Act, 15 U.S.C. § 1052(a). Jurisdiction of this Court exists under the provisions of 15 U.S.C. § 1121 and 28 U.S.C. §§ 1332 and 1338.

#### B. *The Complaint*

The Complaint alleges the following facts. The Plaintiff, Kardex Systems, Inc. ("Kardex" hereinafter), is a New York corporation with a principal office and place of business in Marietta, Ohio. Kardex, formerly known as R.Q.A. Office Systems Products, Inc., is presently and has for many years been engaged in the business of manufacturing and selling office systems, office supplies and related equipment. By an Asset Sale Agreement dated September 1, 1978, Kardex purchased from Sperry Rand Corporation ("Sperry" hereinafter) certain trademarks, goodwill and other assets of Sperry's Office Systems Business. The trademarks in question consist of various specific marks registered in the United States, which, it is asserted, are valid, subsisting, uncancelled and unrevoked. The validity of these registered marks has become incontestable under the provisions of 15 U.S.C. § 1065. Kardex also purchased various unregistered marks previously used by its predecessor, Sperry. These include the mark "Industriever" and various "Rem" combination marks, including "Remcraft," "Remklip," "Rem-Stik," "Remtag," and "Remtex." Kardex and

Sperry have used these marks to identify high-quality products originating from a single source. According to the Complaint, the identified marks have built up valuable goodwill of which Kardex is presently the owner. Under the Asset Sale Agreement, Kardex acquired from Sperry its "entire existing inventory of products and literature, including products and literature bearing the marks Remington, Remington Rand and other "Rem" combinations." Complaint ¶ 20.

It is further alleged that the Defendant, Sistemco, N.V. ("Sistemco" hereinafter), a corporation of the Netherlands Antilles with a principal place of business at Curacao, Netherlands Antilles, acquired by assignment from Sperry the right to use outside of the United States various marks including "Kardex," "Remington," and various "Rem" combinations. Sistemco allegedly did not acquire any rights by such assignment to the use of the identified marks in the United States. Therefore, Sistemco and the other Defendants "are attempting to capitalize on the goodwill of Plaintiff Kardex in the United States by claiming rights to the names and marks Kardex, Industriever and Remstar in the United States and by using these names and marks in a manner likely to cause confusion and to unfairly compete with the Plaintiff." Complaint ¶ 26. Subsequent to Kardex's acquisition by the asset sale from Sperry of its rights in the identified marks, Sistemco filed applications in the United States Patent and Trademark Office to register the marks Kardex, serial no. 309,453, Industriever, serial no. 257,987, and Rem-Star, serial no. 292,797, for automatic storage and retrieval apparatus. Kardex opposed the applications for the marks "Kardex" and "Remstar." Kardex filed no opposition to the application for use of the mark "Industriever" issued to Sistemco by Reg. No. 1,174,934 "because Kardex was unaware of said application." *Id.*, ¶ 28. Plaintiff asserts that Sistemco's claim of ownership of an exclusive right to the use of the three marks through its applications to register those marks in the United

States was known to be false when made and constitutes a fraud on the United States Patent and Trademark Office. *Id.*, ¶ 31.

It is further alleged that Sistemco has established as its subsidiary in the United States the Defendant, Remstar International, Inc. ("Remstar" hereinafter), and that this subsidiary of Sistemco has offered for sale in the United States mechanized storage and retrieval units under the marks "Industriever" and "Remstar." *Id.*, ¶ 35. Remstar's representatives "have held themselves out as being associated with Kardex." *Id.*, ¶ 36. Also, according to the Complaint, the conduct of the Defendants in claiming the right to the use of the names and marks "Kardex," "Industriever," and "Remstar" in the United States and the actual use of those names and marks in the United States is likely (1) to cause confusion, mistake and deception as to the relationship of Sistemco and Remstar with Kardex; (2) to "imbue Defendants' products and business with the quality and reputation associated with plaintiff's products and business," *id.*, ¶ 37(b); (3) to lead to the products of Sistemco and Remstar being passed off as the products and business of Kardex, *id.*, ¶ 37(c); and (4) falsely to induce potential customers and existing customers of Kardex to believe that Sistemco and Remstar are successors to Sperry. *Id.*, ¶ 37(d). These effects of the Defendants' conduct allegedly will cause substantial and irreparable injury to the interests of the Plaintiff and of the public. *Id.*, ¶ 37. The Defendants, Sistemco and Remstar, undertook the use of the specified marks with the knowledge of Kardex's and Sperry's prior use of them in the United States. Such conduct, it is asserted, constitutes "the use of false designations of origin, false descriptions or representations, tending to falsely describe and/or represent defendants' goods and business as those of plaintiff's." *Id.*, ¶ 39. Finally, it is asserted that the Defendants have caused or procured the utilization of the described names and marks and that Plaintiff believes that it is likely to be damaged by the described conduct of the Defendants

which is asserted to be in violation of the Lanham Act, 15 U.S.C. § 1125(a). *Id.*, ¶ 40.

On the allegations represented by the foregoing summary of the Complaint are founded Kardex's claims for violation of the Lanham Act, infringement of Kardex's registered and unregistered trademarks, unfair competition and false association. In the Complaint Kardex seeks to obtain an injunction permanently prohibiting the Defendants from further pursuit of the conduct described in the Complaint. Plaintiff additionally seeks cancellation of Sistemco's U.S. Registration No. 1,174,934 for the "Industriever" mark, as well as an order requiring Sistemco to abandon with prejudice its applications for the "Kardex" and "Remstar" marks. Finally, Plaintiff seeks punitive damages for willful and deliberate infringement of Kardex's marks and the recovery of the costs of the present suit, including reasonable attorneys' fees.

### C. *The Answer and Affirmative Defenses*

The Defendants answered the Complaint on December 5, 1983, denying the operative substantive allegations of the Complaint and asserting numerous affirmative defenses. These include:

(1) the denial that the Defendants infringe "any valid and subsisting marks, whether registered or unregistered, of Kardex ....", Answer at 9;

(2) the allegation that Sistemco and Remstar "have the sole and exclusive right to use the marks 'Industriever' and 'Remstar' for automatic storage and retrieval apparatus," *id.*;

(3) the allegation that Sistemco is the owner of specific U.S. trademark registrations for the names "Industriever," "Remstar," and "Remdex," which registrations are asserted to be valid and subsisting, *id.* at 9–10;

(4) the allegation that the unregistered mark "Industriever" had been abandoned by Sperry over two years prior to the Asset Sale Agreement be-

tween Sperry and Kardex's predecessor, *id.* at 10;

(5) the denial of the occurrence of any actual confusion by virtue of Remstar's use of the "Industriever" mark on its products, *id.* at 10;

(6) the allegation that Kardex is estopped to challenge Sistemco's right to the "Industriever" mark as federally registered by virtue of its failure to initiate a cancellation proceeding against Sistemco in the U.S. Patent and Trademark Office, *id.* at 10–11;

(7) the denial that Kardex has any exclusive right to the use of "triever" or a suffix similar thereto for automatic storage and retrieval products, *id.* at 11;

(8) the allegation that Kardex is estopped by laches because it has brought the pending action belatedly after Remstar has invested substantial amounts of effort and money in promoting products under the "Industriever" and "Remstar" marks, *id.*;

(9) the allegation that Kardex unsuccessfully opposed Sistemco's "Remstar" application before the U.S. Patent and Trademark Office, *id.* at 11–12;

(10) the allegation that Kardex "is guilty of inequitable conduct" because it has allegedly marked brochures distributed to the public indicating that certain marks containing the suffix "triever" were registered marks when, in fact, such was not the case, *id.* at 12.

## D. *The Counterclaims*

Sistemco and Remstar then assert counterclaims against Kardex for alleged infringement by Kardex of the "Industriever" mark on the following allegations of fact. They allege that Sistemco is the owner of a valid and subsisting U.S. Trademark Registration, *id.*, and that Sistemco and Remstar have the right to the exclusive use of the "Industriever" mark for automatic storage and retrieval apparatus in the United States. *Id.* at 12–13. Defendants further allege that Kardex commenced using the "Industriever" mark in advertising automatic storage and retrieval apparatus only after it had actual or constructive knowledge of Sistemco's federal registration of the mark for such apparatus. *Id.* at 13. Kardex's conduct, it is asserted, is likely to cause confusion, mistake or deception among customers for such apparatus by leading them to believe that Kardex and its products and business are associated with those of Sistemco and Remstar, or that Kardex's products and business have the same quality and reputation associated with those of Sistemco and Remstar. *Id.* at 13. Sistemco fears that this confusion will cause irreparable injury to the interests of the public and Sistemco and Remstar. *Id.* According to the counterclaim, Kardex's conduct constitutes willful infringement of Sistemco's federally registered "Industriever" mark in violation of 15 U.S.C. § 1052(d), is a violation of the Lanham Act, 15 U.S.C. § 1125(a), and constitutes a deceptive trade practice under both the Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. § 1212, and similar acts of other states in which Kardex has carried out such conduct. *Id.* at 15. Kardex's conduct also allegedly constitutes unfair competition and illegal dilution of the distinctive quality of Sistemco's "Industriever" mark, in violation of the laws of both Maine and other states. *Id.* at 16. Finally, it is claimed that Kardex's conduct constitutes a "false association" of its products with the Defendants in violation of 15 U.S.C. § 1052(a) and the Maine law of unfair competition. *Id.* at 17. Sistemco and Remstar seek relief parallel to that sought by Kardex in its Complaint except that they specifically seek preliminary injunctive relief. *Id.* at 17–19.

The matter came before the Court for preliminary pretrial conference on February 9, 1984. At the conference counsel agreed that there was a need for emergency consideration of the claim for injunctive relief due to a mutually contemplated con-

flicting use by the parties of the "Industriever" mark at a trade show to be held in Texas on March 27, 1984. With the consent of the parties, the Court ordered Plaintiff to file a cross-motion for preliminary injunctive relief as to use of the trademark "Industriever" and set forth an expedited basis for partial discovery in the case relating to the use of "Industriever." Plaintiff filed a Motion for a Preliminary Injunction on February 10, 1984. The Court further specified a schedule for the completion of various items of preparation by counsel for the hearing, and the matter was scheduled by special assignment to be heard by the Court on the Cross-Motions for Summary Judgment on March 19, 1984.[1]

Following a hearing on the cross motions and oral argument of counsel, the Court now renders its decision on the Cross-Motions for Summary Judgment filed by the parties. Pertinent findings of fact and conclusions of law are set out in this Opinion.

## II. PRELIMINARY INJUNCTIVE RELIEF

In order to obtain preliminary injunctive relief each party must satisfy four essential requirements. This Court has had occasion in the past to set out succinctly those requirements in *UV Industries, Inc. v. Posner*, 466 F.Supp. 1251 (D.Me.1979) (per Gignoux, J.):

It is well settled law that, in the ordinary case, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Id.* at 1255; *see also Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979) (per Gignoux, J.). This formulation of these criteria has been approved by the United States Court of Appeals for the First Circuit. *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (*quoting Women's Community Health Center, Inc.*); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir.1969); *Automatic Radio Manufacturing Co., Inc. v. Ford Motor Co.*, 390 F.2d 113 (1st Cir.1968) *cert. denied*, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). This Court has only recently indicated the continuing applicability of these requirements to requests for temporary injunctive relief. *Stanton v. Brunswick School Department*, 577 F.Supp. 1560 (D.C.Me.1984) (per Carter, J.); *Sheck v. Baileyville School Committee*, 530 F.Supp. 679 (D.Me.1982) (per Cyr, J.).

Further, it is well established law that the Court is to bear constantly in mind that an "[i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case." *Plain Dealer Publishing Co. v. Cleveland Type Union #53*, 520 F.2d 1220, 1230 (6th Cir.1975), *cert. denied*, 428 U.S. 909, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). The Court's hesitation to utilize so drastic an aspect of its prerogative should be heightened where the relief requested is only temporary in nature. *Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037, 1047 (C.D. Cal.1977).

The purpose of preliminary injunctive relief is to preserve the *status quo* until a final adjudication can be had upon the merits. *Toledo, A.A. to N.M. Ry. Co. v. Pennsylvania Co.*, 54 F. 730 (C.C.N.D. Oh.1893). Preliminary injunctions are appropriate in trademark litigation where there is an obvious likelihood of confusion between two identical names or marks and

---

1. The Court wishes to formally commend all counsel in this case for their thoroughgoing responsiveness to the Court's requirements in respect to preliminary preparation. The Court was provided, several days in advance of hearing, with detailed witness lists, exhibit lists, specifications of objection to Documents, Exhibits, Trial Briefs and a complete set of the Exhibits of each party. This has greatly facilitated the Court's effort to respond expeditiously to the temporal needs of the parties. The Court is most appreciative of counsel's efforts.

810

a resulting difficulty in ascertaining the possible loss of sales, goodwill and reputation. *Park 'N Fly, Inc. v. Park & Fly, Inc.*, 489 F.Supp. 422, 424 (D.Mass.1979); *see also Trak, Inc. v. Benner Ski KG*, 475 F.Supp. 1076 (D.Mass.1979). The First Circuit Court of Appeals has recently pointed out that none of the specified criteria should be slighted. *Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *see also LeBeau v. Spirito*, 703 F.2d 639, 642 (1st Cir.1983).

In the present controversy on the Cross-Motions for Summary Judgment, the parties do not dispute the satisfaction of three of the four requirements. It is agreed that one party or the other will suffer irreparable injury if a preliminary injunction is not granted determining the lawful owner of the mark "Industriever" and prohibiting its use by the other party at the materials handling trade show to begin in Texas on March 27, 1984. It is likewise agreed that the injury which will result to the lawful owner of the mark by the absence of a preliminary injunction will outweigh any harm which the granting of the preliminary injunction would cause to be inflicted on the non-owner. Finally, the parties agree that the public interest will not be adversely affected by the granting of an injunction. Rather, the public interest will be served by the granting of the injunction because public mistake, confusion and deception will be avoided thereby with respect to the identification of materials handling apparatus being sold in commerce. This Court has satisfied itself by its independent inquiry of the record made at hearing that each of these three criteria is satisfied. Thus, the only remaining question on the Cross-Motions for Summary

Judgment is whether either party has "exhibited a likelihood of success on the merits." *Posner*, 466 F.Supp. at 1255. In this respect this case is in the tradition of cases in this circuit seeking preliminary injunctive relief in which "the probability-of-success component has loomed large ...." *Auburn News Co.*, 659 F.2d at 277.

### III. LIKELIHOOD OF SUCCESS ON THE MERITS [2]

#### A. *The Burden of Proof*

In determining the likelihood of success of either party on the merits at trial, a critical step is the ascertainment of the locus of the burden of proof on the various questions to be decided in resolving the issue of ownership of the "Industriever" mark. In the case of a plaintiff seeking relief for alleged infringement of an unregistered mark, the burden is initially upon the plaintiff "to establish his right to exclusive use" of the mark. *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 (1st Cir.1980). This burden is to be carried by showing that plaintiff has acquired the ownership of the unregistered mark by an appropriation and use of the mark in commerce prior in time to the occurrence of the use of the mark by the claimed infringer, the defendant. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). *Columbia Mill Co. v. Alcorn*, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144 (1893). The mark must be so designed as to have "as its primary object and purpose, to indicate the owner or producer of the commodity and to distinguish it from like articles manufactured by others." *Columbia Mill Co.*, 150 U.S. at 463, 14 S.Ct. at 151. The standard of proof applicable to this effort is that of a preponderance of the evidence. *See Keebler Co.*, 624 F.2d at 373.[3]

---

**2.** The parties have stipulated that the use of the "Industriever" mark by a nonowner will infringe upon the legal owner's right to the exclusive use of the mark; that is, that the mark has acquired a secondary meaning and that its use will create a likelihood of confusion among potential buyers of materials handling equipment. Thus, the only substantive issue that need be addressed by the Court to determine, as

between the parties, the likelihood of their respective success on the merits is the issue of the present ownership of the "Industriever" mark.

**3.** Because Kardex must promote and defend the exclusive use of the "Industriever" mark as an unregistered mark governed by common-law trademark principles, an incipient choice-of-law problem exists. The Lanham Act does not pre-

The effect of registration of a mark under 15 U.S.C. § 1115(a) is, by the explicit terms of the statutory language, that the registration becomes "prima facie evidence of registrant's exclusive right to use the registered mark in commerce." Here, Sistemco has proven a registration of the "Industriever" mark as of October 27, 1981. Defendant's Ex. 48. That proof constitutes a *prima facie* showing of Sistemco's ownership of the exclusive right to use the mark. On their counterclaim for an adjudication of their exclusive right to the use of the "Industriever" mark, Defendants Sistemco, Remstar International, Sistemco's subsidiary for marketing and distribution of materials handling machines bearing that mark in the United States, and Kenneth W. Byers, President of Remstar International, bear a plaintiff's burden of proof as in the normal case. The proof of registration of the mark by Sistemco, however, operates "to shift the burden of proof from the [registrant], who in a common law infringement action would have to establish his right to exclusive use, to the [nonregistrant user], who must introduce sufficient evidence to rebut the presumption of the [registrant's] right to such use." *Keebler Co.*, 624 F.2d, at 373.

Thus, the burden remains on Kardex, as the nonregistrant user of the "Industriever" mark to show by a preponderance of the evidence that it, or its predecessor in ownership of the mark, Sperry, appropriated the mark to itself by use in commerce prior in time to October 27, 1981, both to identify its carousel material handling apparatus as originating from Kardex, or Sperry, and to distinguish its apparatus from like devices manufactured and sold by others.

On satisfaction by Kardex of that burden, the Court must then address

empt state efforts to establish and protect rights in trademarks. The Supremacy Clause prohibits only state law which would allow deceptive practices intended to be prohibited by the Lanham Act. *Keebler Co.*, 624 F.2d 372, n. 3. It is clear that in the First Circuit, at least, principles of the federal common-law of trademarks developed prior to enactment of the Lanham Act are not controlling in cases arising after its enactment, though they may be persuasive. *Id.*, at 373. The practice of the federal courts, where the issue has received any treatment at all, has been to regard both the federal common-law of trademarks and such state common law on the subject as may exist, as forming a common reservoir of precedent and authority for post-Lanham Act decision-making purposes. *Keebler Co.*, 624 F.2d 372; *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, n. 1 (2d Cir.1956). All that seems to be required is that the state common-law of trademarks not be incongruous with the federal law on the subject. *Keebler Co.*, 624 F.2d 372. The Court of Appeals for the Second Circuit appears to have concluded that *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) requires "the application of state law to unfair competition claims, whether or not combined with a trademark infringement claim under federal law." *Maternally Yours*, 234 F.2d at 541, n. 1.

Here, the Asset Sale Agreement provides that it is to be governed and construed in accordance with New York law. Defendants' Ex. 1, § 27. The state law of the forum, however, is that of Maine, and this is a suit involving the right of the Defendant, a Maine-based corporation, to use the "Industriever" mark in activities emanating from Maine. At issue, for present purposes, is the ownership of the "Industriever" mark. The Court's research into Maine common-law on the acquisition and termination of the right to use of a trademark discloses only one Maine case on the whole subject matter, and that does not pertain to the issues raised in the pending matter. *See Skene v. Graham*, 116 Me. 202, 100 A. 938 (Me.1917). In addition, there is a single federal case, apparently applying Maine law in part, which is equally inapposite to this case. *See Manhattan Medicine Co. v. Wood*, 16 Fed.Cas.No. 9026 (1878), *aff'd* 108 U.S. 218, 2 S.Ct. 436, 27 L.Ed. 706 (1883). Thus, Maine common law on the subject at issue in this case cannot be said to be in a state of incongruity with the federal common law.

Even if this Court were to make a discrete decision to apply New York law, which incidentally, it does not see any need to do, that would have little effect on the ultimate outcome of the pending motions. It has been observed that the Second Circuit Court of Appeals has usually "lump[ed] federal and New York law together ... or—even more conveniently—eschew[ed] all references to the matter." *Maternally Yours*, 234 F.2d 538, 545 (omitting citation) (Clark, C.J., concurring). In view of the miniscule likelihood of any effect upon the result to be achieved, the Court has no hesitation in applying the law as articulated in what appear to it to be the best-reasoned cases, whether state or federal and wherever arising. Thus may be dispatched all concern with what Chief Judge Clark referred to as the need for "subterfuge or ornamental rationalization," *id.* at 546.

Sistemco's defense that even though the use of the mark was so appropriated by Kardex and/or Sperry, its exclusive use was lost by abandonment through nonuse. The burden is on the party asserting that defense to strictly prove the elements of abandonment through nonuse. *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 139 (3d Cir.1981). "[A]bandonment, being a forfeiture of a property interest, should be *strictly proved,* ... and the statutory aid to such proof should be narrowly construed." *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980) (omitting citation) (emphasis added); *Hurricane Fence Co. v. A–1 Hurricane Fence Co.,* 468 F.Supp. 975 (D.Ala.1979). Thus, the provision of 15 U.S.C. § 1127, which states "[n]onuse for two consecutive years shall be determined abandonment" is only an aid to the proof of abandonment by nonuse, merely creating a rebuttable presumption of abandonment where two years of consecutive nonuse is proven. *Saratoga Vichy Spring Co., Inc.* 625 F.2d at 1044. The prior user (here, Kardex) may, in such event, undertake to rebut the evidence presented by the subsequent user (here, Sistemco) to "strictly prove" abandonment through nonuse.

The Court being satisfied and finding that Sistemco has proven its registration of the "Industriever" mark pursuant to 15 U.S.C. § 1115(a) as of October 27, 1981, the burden remains with Kardex to prove its prior appropriation to commercial use prior in time to October 27, 1981. The Court is also satisfied that, on the present record, Kardex has carried the burden of showing that Sperry, Kardex's predecessor in ownership of the mark, had effectively appropriated the exclusive right to use the mark in the period from 1966, when the mark was first utilized, to the June 12, 1975 "destandardization" of the machine. The Court also finds, however, that Kardex has made no commercial use of *the mark "Industriever," itself,* as § 1115(a) specifically requires, after the Asset Sale and prior to October 27, 1981. Kardex's ownership of the exclusive right to the use of the "Industriever" mark, therefore, depends, in

part, upon the quality of the property interest it acquired in the mark under the September 1, 1978, Asset Sale from Sperry. Thus, in order to resolve the issue of ownership of the exclusive right to use the mark, the Court must address three remaining issues: (1) whether Sistemco has "strictly proved" that Sperry abandoned the mark through nonuse before the September 1, 1978, Asset Sale to Kardex; (2) if not, whether Sistemco has "strictly proved" that Kardex thereafter abandoned the mark through nonuse prior to October 27, 1981; and (3) whether the property interest in the mark passed to Kardex by the Asset Sale includes the right of exclusive use. The Court now addresses those issues in the order listed.

### B. *Proof of Abandonment by Sperry*

It is essentially undisputed, and the Court has so found, that Sperry was engaged in continuous use of the "Industriever" mark from 1966, the time of the first sale of a materials handling apparatus bearing that mark, to the time that Sperry "destandardized" that particular apparatus effective June 12, 1975. In that period Sperry had sold slightly less than one hundred units bearing the "Industriever" mark and had issued service and parts manuals accompanying those units which also bore the mark. It had also distributed sales and service materials bearing the mark to over two hundred field offices and dealers who sold the Industriever unit for Sperry.

There can be no question that in the period from 1966 through 1977 Sperry was actively engaged in utilizing the mark in manufacturing and selling in commerce machines intended to be identified by the mark. These machines were the only apparatus of similar size and capacity, serving the same purpose, which bore the mark. Nor can there be any doubt from the record that the mark identified a particular machine and, by common usage in the marketplace, identified Sperry as the sole manufacturer of that machine. Thus, Sistemco's defense of abandonment, based on nonuse *of the mark,* can only have bite against Sperry, if at all, in the period from June 12,

1975, after destandardization occurred, to the September 1, 1978, Asset Sale to Kardex. That is the only period of time from 1966 to the acquisition ·of the mark by Kardex when there is any evidence at all of nonuse by Sperry *of the mark.*

To establish the defense of abandonment of a mark by nonuse, a party must establish two elements: (1) a practical nonuse of the mark; and (2) an accompanying *intent* to abandon the use of the mark, that is, an intent not to resume use of the mark in the future. *See Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60 (1900). As previously noted, because an adjudication of an abandonment causes a forfeiture of a property interest, each element of an abandonment must be "strictly proved." *Saratoga Vichy Spring Co., Inc.,* 625 F.2d at 1044.

As to the first element of an abandonment, there must be a nonuse, that is, an absence of any use. "[A] mere temporary withdrawal from the market forced by outside causes" does not result in an abandonment of use. *Miller Brewing Co. v. Oland's Breweries Ltd.,* 548 F.2d 349, 352 (C.C.P.A.1976). Any use of the mark, even a "single instance," is sufficient to defeat a defense of abandonment if such use is made in good faith. *Carter-Wallace, Inc. v. The Proctor & Gamble Co.,* 434 F.2d 794, 804 (9th Cir.1970) (*citing Mendes v. New England Duplicating Co.,* 94 F.Supp. 558, 560 (D.Mass.1950), *aff'd,* 190 F.2d 415 (1st Cir.1951)). Here Sistemco argues that, after the "destandardization" of the "Industriever" machine manufactured by Sperry, there was no *use* of the mark. This is so, it asserts, because there were no machines sold after that date, even if it is conceded that Sperry remained willing to manufacture and sell machines to special order.

Kardex, on the other hand, maintains that there was a use of the mark because Sperry continued to provide service, parts, and technical advice concerning repair and use of the only machines in the United States then bearing that mark. Further, Kardex maintains, that such use was also continued through (1) the established secondary meaning of the mark identifying Sperry as the producer of those machines, and (2) service and parts manuals clearly bearing the mark. This, it says, is a use of the mark because those activities could not be carried out effectively but for the identifying meaning accorded to the mark in actual fact.

As a practical matter, Kardex's argument has facial appeal. However, a contradicting definition of "use" contemplated by the Lanham Act is clearly set out in 15 U.S.C. § 1127 immediately previous to the definition of abandonment of use expounded there. The pertinent language reads "[f]or the purposes of this chapter a mark shall be deemed to be used in commerce (a) *on goods* when it is placed in any manner *on the goods or their containers* or the displays associated therewith or on the tags or labels affixed thereto *and the goods* are sold or transported in commerce ...." 15 U.S.C. § 1127 (emphasis added). Here it is well established in the record that the spare parts sold by Sperry after 1975 did not bear the "Industriever" mark. There is no evidence of any labels or tags bearing that mark being attached to any of the spare parts actually sold by Sperry. It must be concluded that when the statute goes on to define an abandonment in terms of a discontinuance of "use" that it uses the word "use" in the sense in which that word is defined "[f]or the purposes of this chapter ...." in the immediately preceding paragraph of the statute.

Hence, it is apparent that the statute contemplates a "discontinuance" of "use" when for a period of time there is no sale or transportation in commerce *of goods bearing the disputed mark.* Sistemco has established that no goods were sold by Sperry bearing the "Industriever" mark from June 12, 1975, through September 1, 1978. Accordingly, it has carried its burden of strictly proving the first element of abandonment by the conduct of Sperry under § 1127, that is, nonuse of the mark.

Sistemco must similarly prove, however, the second element of an abandonment of the mark by Sperry, that is, the existence on the part of Sperry during the period 1975–1978 of an "intent not to resume" the use of the "Industriever" mark. 15 U.S.C. § 1127. As the statute provides, "[i]ntent not to resume *may be inferred* from circumstance." 15 U.S.C. § 1127 (emphasis added). The requisite substantive element of intent, as is generally the case with proof of intent, is seldom capable of direct proof. Of necessity, such intent must be inferred or deduced to exist from the proven circumstances which may properly be taken to reflect Sperry's intentions. The statute assists the evidentiary process by specifically providing that where nonuse of the mark is proven to have continued for two consecutive years, a *prima facie* showing of abandonment is made. That is the case here since the period in question extends from June 12, 1975, Defendants' Ex. # 9, to September 1, 1978, Defendants' Ex. # 1, a period of three years and three months.

The *prima facie* showing is subject to rebuttal, however. Here the circumstances show that as of June 12, 1975, Sperry was entering a difficult and steadily worsening phase of its financial well-being. It had a large product line, some elements of which were profitable while others were not. The "Industriever" unit represented a significant investment for Sperry's customers. Therefore, negotiation of sales of "Industriever" machines, as well as the process of their physical manufacture, was an expensive and time-consuming undertaking. The "Industriever" unit was ultimately less profitable than other items in Sperry's product line, with sales of slightly less than 100 units between 1966 and 1975.

Sperry chose, in this circumstance, not to discontinue the line, but rather, to stop making the "Industriever" units *for inventory.* It proposed not to terminate production of the units but to limit production to the actual demand for the product. It continued to provide service for the units already sold through its own personnel. It continued to carry an active inventory of the most commonly required parts for repair purposes. Throughout the time in question, Sperry periodically updated its inventory supplies of the designated repair parts as they were diminished, and it retained the capacity to make other parts to special order as they might be required. Actively selling parts over the period in question to various purchasers of the units, Sperry continued in 1977 and 1978 to list the "Industriever" mark as one of its trademarks.

During the period of 1975 to 1978 it decided upon a significant divestiture of its various product lines, including its materials handling apparatus line. Sperry sold its typewriter business. It sold the rights to its European manufacture, sales and distribution of its products. It sold the assets of its Office System Division to Kardex. A common pattern to all these transactions was the sale of the physical assets and intangible property associated with the various enterprises, together with the intellectual properties, such as patents and registered and unregistered trademarks, involved in the execution of the enterprise. The record justifies the inference that Sperry sought to derive the maximum dollars possible from those divestitures. Clearly, intellectual properties were treated as an asset having value which Sperry wanted to recapture in the form of capital dollars. An abandonment of a trademark associated with a significant line of product sales would be totally inconsistent with such a design.

In its transactions with Mr. Anderson, acting on behalf of Kardex, Sperry bargained for sale of significant intellectual properties and specifically held out, *inter alia,* the "Industriever" mark as a viable unregistered mark having strong market potential. It did this to induce the purchase by Kardex of Sperry's Office Systems Division's assets as well as the purchase of the "Industriever" and other marks. Mr. Anderson reasonably concluded from the presentation of Sperry representatives that there was value in the mark.

■ Viewed in the overall context of the financial plight of Sperry and its attempt to salvage all that was possible through divestiture, the Court cannot conclude that the circumstance of an absence of specific sales of goods bearing the "Industriever" mark for slightly over three years, when viewed together with the nature of the product, its sales and manufacturing demands, can be taken to strictly prove an intent on Sperry's part to abandon the mark.

Sperry had abundant motivation to maintain the mark for possible future sale. Its failure to produce "Industriever" units during the period was not a result of a voluntary program in any sense; it was due to its straitened business circumstances, which plainly provided legitimate reasons for Sperry's conduct. This falls far short of permanent cessation of the manufacture and sale of the units and the intent associated with such conduct. As such, those circumstances negate an intent to abandon the mark. *See Carter-Wallace, Inc.*, 434 F.2d 794. What is shown is a non-volitional abatement of "Industriever" sales activities, *see Kelly Liquor Co. v. National Brokerage Co.*, 102 F.2d 857 (C.C.P.A.1939), and not a capitulation to severe, long-lasting and overwhelming obstacles to a continued business enterprise, *see Uncas Manufacturing Co. v. Clark & Coombs Co.*, 309 F.2d 818 (1st Cir.1962). There is no strictly proven intent on the part of Sperry to cease its "Industriever" sales activity and depart from the field.

Accordingly, Sistemco has failed, on this record, to carry its burden to show that Sperry abandoned the "Industriever" mark between June 12, 1975, and September 1, 1978.

## C. *Proof of Abandonment by Kardex*

With respect to its defensive claim that Kardex abandoned the "Industriever" mark through nonuse in the period from September 1, 1978, through October 27, 1981, Sistemco successfully carries its burden of strict proof on the first element of that defense; namely, that there was nonuse, in the statutory sense, of the mark during that period. It does so for the same reason that it succeeded with respect to the abandonment defense as applied to Sperry during the earlier period: the record establishes beyond a doubt that although Kardex continued during the specified period to provide service and parts to the Sperry Industriever units, some sixty-six in number, it did not "use" the mark in the sense required by § 1127. No "goods" were sold in commerce bearing the "Industriever" mark. The mark did not appear on the parts sold to its dealers or on those sold to owners of "Industriever" units. These were the only "goods" relating to the "Industriever" units sold by Kardex from September 1, 1978, through October 27, 1981. Therefore, Sistemco has strictly proved that there was a nonuse of the mark by Kardex during this period of time.

However, as to the second element of abandonment, Kardex's intent not to resume the use of the mark during this time period, the resolution of that issue is more finely drawn on the evidence. The record shows that pursuant to the Asset Sale Agreement, Kardex purchased all of Sperry's assets, tangible and intangible, associated with Sperry's business activities in the office systems and materials handling business. Kardex and Sperry specifically bargained for sale of the "Industriever" enterprise including all of Sperry's tangible and intangible assets associated therewith.[4]

---

**4.** Sistemco points out that the Asset Sale Agreement speaks in its fourth paragraph of the purchase of "certain tangible and intangible assets used in the Office Systems Business" and the assumption of "certain obligations and liabilities associated with the Office Systems Business" of Sperry. Defendants' Ex. 1, at 2. From this fact, Sistemco launches an argument that the Agreement was not intended to convey the "Industriever" mark since that was a mark asso-

ciated with a different enterprise (e.g., materials handling and retrieval) than that covered by the Asset Sale Agreement (e.g., office systems and supplies). It must be first noted that the argument is somewhat weakened by the fact that some office systems, such as Sperry's "Lektriever" units, employed the same carousel retrieval technology in an application to retrieval projects in an office setting. The Agreement clearly was intended to transfer, and was treat-

The "Industriever" mark was specifically conveyed by the Agreement. After the Asset Sale, Kardex continued to provide service, technical assistance and spare parts to Sperry's "Industriever" customers. That was a significant business enterprise in which a total of over 6,000 "Industriever" parts were sold from 1976 to the date of the filing of the Complaint. Defendants' Exs. 12 and 35. In 1979 alone, after Kardex had taken over the enterprise, a total of over 2,300 parts items were sold. Defendants' Ex. 12A.

Additionally, as part of the Asset Sale, Kardex assimilated Sperry's employees associated with the "Industriever" business. Those employees continued to give service and technical assistance to dealers and for- mer Sperry customers as the need arose with respect to the existing "Industriever" units. This involved responding to six to eight calls annually after the Asset Sale. Kardex also maintained contact with "Industriever" dealers and customers. Mr. Anderson met with the dealers prior to the consummation of the Asset Sale to cement Kardex's relationship with them. There continued to be expressions of dealer interest in the "Industriever" line and requests for prices of units to which Kardex responded.

Kardex embarked immediately after the Asset Sale upon a process of evaluating "New Product Ideas" associated with the Sperry Asset Sale. On October 17, 1978, a month and a half after the date of the sale,

ed by the parties to the Agreement as in fact transferring, the "Lektriever" mark and technology, which is essentially identical to that utilized in the "Industriever" units. The main distinction between these two types of units is their respective capacities to accommodate aggregate weights and sizes of the objects stored therein for retrieval. With only slight modification, "Lektriever" units could be utilized, and were in fact utilized, for materials retrieval applications involving small objects. Such an application is also seen in the case of Sperry's "Drugstriever" unit, the rights to which were also treated by the contracting parties as transferred to Kardex by the Asset Sale Agreement.

The short answer to Sistemco's argument that the "Industriever" mark was not conveyed is that the Asset Sale Agreement specifically provides for its transfer. Paragraph 1(h) of the Agreement provides for transfer of all of Sperry's trademarks listed in Schedule G to the Agreement, subject to the provisions of Sections 9 and 10(g) of the Agreement. *Id.* at 4. Schedule G lists the "Industriever" mark as an "unregistered trademark," reciting also that it is related to "[m]echanized storage bins-for industry." *Id.* at 4. Nothing in Section 9 of the Agreement would exclude the "Industriever" mark from passing under the Agreement by virtue of its listing in Schedule G. *Id.* at 13–14. Nor is any language in Section 10(g) operative to have that effect. In fact, to the contrary, Section 10(g) explicitly states: "Except as set forth in Schedules G–1 and G–2, the trademarks *set forth in Schedule G* constitute all of the trademarks *used in the Office Systems Business* during the two (2) year period ending on the date of this Agreement." *Id.* at 16. (emphasis added.) The "Industriever" mark is not affected by Schedule G–1 or Schedule G–2. *Id.,* Schedules G–1 and G–2.

These provisions, taken together, could not make it more clear that it was intended by both Sperry and Kardex that the "Industriever" mark be conveyed to Kardex by the Asset Sale Agreement. For purposes of determining the legal effect of the Agreement, under principles of contract law, clearly the Agreement had that effect. The last provision is highly persuasive evidence, in addition, that Sperry treated its "Industriever" business for operational purposes, prior to the effective date of the Asset Sale Agreement, as part of its Office Systems Business. This point is buttressed by the fact that the Agreement specifically provides for Kardex to take over and assume Sperry's continuing contractual obligations under its sales agreements with its "Industriever" customers, providing service, parts and technical assistance for a specific term with respect to the "Industriever" units then in place. Kardex in fact assumed and carried out these obligations. Absent an intent to exploit that market area, Kardex would have no interest in undertaking these commitments.

Thus, it is convincingly shown that, for purposes of the Asset Sale, Sperry's "Industriever" materials handling enterprise was considered to be part of Sperry's Office Systems Business and that all of its tangible and intangible assets relating to that enterprise, subject only to the specific exclusions of certain assets which are of nominal impact, were covered by the Agreement. The ownership of those assets was effectually legally transferred to Kardex by the Agreement. That conclusion is further supported by Mr. Anderson's thoroughly credible testimony that Sperry's representatives bargained for sale of those assets using their future market potential as an inducement to Kardex to enter into the Asset Sale. Mr. Anderson found that potential to be persuasive as an incentive to buy Sperry's assets.

Mr. Anderson circulated a memorandum to Kardex's development personnel seeking opinions "related to the new product ideas described on the attached list." Plaintiff's Ex. Q. The first "New-Product Idea" listed on the attachment to the memorandum was an "Automated material-handling device, to meet same market needs as former RANDTRIEVER or INDUSTRIEVER." Plaintiff's Ex. Q. The minutes of Kardex's regular "Product Development Meetings" from December 11, 1981, to December 14, 1983, show a continuing discussion and significant pursuit of the development of an "Industriever" unit. Plaintiff's Ex. B. This establishes that Kardex contemplated a return to that segment of the materials handling market occupied previously by Sperry's "Industriever" enterprise.

Kardex has spent approximately $300,-000 in that effort, about 50% of that amount going for advertising expenses for the new unit actually developed, which Kardex now is in the process of marketing. Kardex's development effort was delayed initially and slowed over a period of time for valid business reasons. Its need to financially rejuvenate the total Sperry enterprise acquired by the Asset Sale required the prioritizing of the utilization of Kardex's financial and personnel resources to that end.

In the face of these facts, it cannot be said that Kardex's failure to produce and market an "Industriever" unit between September 1, 1978, and October 27, 1981, proves by a strict evidentiary standard an intent on the part of Kardex not to resume the use of the "Industriever" mark which it acquired in the Asset Sale. The reason for that period of inactivity in actual sales is persuasively explained by the fact that Kardex did not initially have the capability to market such a unit except to special order. Its intent to return to that market, however, is effectively bespoken by (1) Anderson's interest in the "Industriever" enterprise and the properties associated with it, including the mark, for all of which he apparently paid a significant consideration; (2) Kardex's immediate exploration of the development prospects of the "Industriever;" (3) Kardex's continuing activities in providing service and assistance to owners of existing units and dealers associated with them in the maintenance effort; (4) Kardex's continuing contacts with the dealers who handled the units and with the materials handling market, generally; and (5) Kardex's devotion of significant levels of resources to a development and advertising effort as soon as it was feasible under a reasonable program of resource allocation. Sistemco's proof of Kardex's intent not to resume the use of the mark does not overcome the clear implications of this pattern of Kardex's continuing interest in reentering that segment of the materials handling market previously occupied by the "Industriever" enterprise and to do so under the "Industriever" mark.

### D. The Asset Sale Agreement as a Transfer In Gross

Sistemco has also raised issues as to whether the Asset Sale between Sperry and Kardex was effective to transfer to Kardex any ownership then existing in Sperry of the right to the exclusive use of the "Industriever" mark. Sistemco's argument is based on two theories. First, Sistemco appears to argue that the ownership of the mark and the right to its exclusive use was not transferred by the Asset Sale Agreement because *as a matter of contract law* the Agreement covered only the assets encompassed within Sperry's Office Systems Business and that the "Industriever" enterprise of Sperry was not a part of the Office Systems Business. For reasons set forth in footnote 4, the Court finds this aspect of the argument to be without merit.

Second, Sistemco argues that the Asset Sale was an *in gross* assignment of the "Industriever" mark. Therefore, under principles of trademark law, the assignment was not effective to convey the right to the exclusive use of the mark to Kardex even if Sperry had not previously abandoned the "Industriever" mark through nonuse and even though the Asset Sale

Agreement purported to transfer it. Kardex alleged in its Complaint that pursuant to the Asset Sale Agreement it purchased from Sperry "trademarks, goodwill and other assets of [Sperry's] Office Systems Business." Complaint at ¶ 15. In its Answer, Sistemco admits that Sperry and Kardex entered into the Asset Sale Agreement, that the Agreement "purported to transfer, *inter alia*, registered and unregistered trademarks along with some assets related to Sperry's Office Systems Business' manufacturing facilities," and denies that any effective transfer of the assets specified in the Complaint occurred. Answer at ¶ 15. Thus, the issue is joined by the pleadings on this point.

 Sistemco's position is based upon the well-known rule that there is no property in a trademark apart from the proprietary interest in the business in which it is utilized. The classic statement of the rule is, "[t]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, at 97, 39 S.Ct. 48, at 50, 63 L.Ed. 141 (1918). The rule has resulted in a limitation upon the transferability of trademarks. "The law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated. Such was the common law rule and is now made a part of the Lanham Act." *Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir.1969);[5] *Avon Shoe Co. v. David Crystal, Inc.*, 171 F.Supp. 293 at 301

("[w]ithout the transfer of some business with which the mark has been used, the assignment is a void assignment *in gross* and conveys no title to the assignee") (emphasis added); *cf. Marshak v. Green*, 505 F.Supp. 1054, 1061, n. 20 (S.D.N.Y.1981) ("it is axiomatic that the goodwill of the business must be transferred along with the mark, for the mark is nothing without the goodwill it symbolizes").

Here, the Asset Sale Agreement purports to convey substantially all of the assets, tangible and intangible, of Sperry's Office Systems Business. The parties to the Agreement intended that the Agreement would pass the "Industriever" mark as a "trademark used in the Office Systems Division for the two years prior to the Asset Sale." Defendants' Ex. 1, at 16. *See, infra*, n. 4. The assets expressly conveyed by the Asset Sale Agreement included: (1) all inventory including finished goods, work-in-process, raw materials, packaging materials, containers, parts and supplies at the Marietta plant as listed in Schedule A, *id.*, § 1(a); (2) the machinery, equipment and tools and dies listed in Schedule B, *id.*, § 1(b); (3) the furniture, fixtures and office equipment listed in Schedule C, *id.*, § 1(c); (4) the real property set forth and described in Schedule D, *id.*, § 1(d); (5) all drawings, specifications and technical data owned by Sperry relating to the Office Systems Business and located at two of that business' principal locations, *id.*, § 1(e); (6) the United States and Canadian patents and patent applications listed in Schedule E, *id.*, § 1(f); (7) Sperry's right, title and interest in and to all orders, contracts and agreements entered into by Sperry in the ordinary course of the Office

---

5. Title 15 U.S.C. § 1060 provides:

A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark, and in any such assignment it shall not be necessary to include the goodwill of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted. Assignments shall be by instruments in writing duly executed. Acknowledgment shall be prima facie evidence of the execution of an assignment and when recorded in the Patent Office the record shall be prima facie evidence of execution. An assignment shall be void as against any subsequent purchaser for a valuable consideration without notice, unless it is recorded in the Patent Office within three months after the date thereof or prior to such subsequent purchase. A separate record of assignments submitted for recording hereunder shall be maintained in the Patent Office.

Systems Business to the extent wholly or partly unperformed by Sperry on the closing date, contracts and agreements with Sperry's sales representatives, distributors and dealers to the extent that they were unperformed on the closing date, motor vehicle lease agreements listed in Schedule F–1, and contracts and agreements entered into by Sperry as listed in Schedule F–2, *id.*, § 1(g)(i)–(iv); (8) Sperry's trademarks as set forth in Schedule G, *"together with the goodwill of the business in connection with which said trademarks are used," id.*, § 1(h) (emphasis added); (9) all of Sperry's customer lists, correspondence with customers, sales and purchase records, sales proposals, office records and other records currently used by Sperry in the Office Systems Business, *id.*, § 1(i); (10) Sperry's prepaid expenses related to the Office Systems Business as listed in Schedule H., *id.*, § 1(j); Sperry's accounts receivable in connection with the Office Systems Business as listed in Schedule I, Defendants' Ex. 1, § 1(k); (12) "all other transferable tangible assets on the books of Sperry ... used in the Office Systems Business at the Marietta plant, other than those referred to or described in Section 2 hereof," *id.*, § 1(1).

Section 2 of the Agreement sets out the following exclusions from the assets transfered by the Agreement: "(a) cash on hand and in bank deposits; (b) any asset or property not related to the Office Systems Business; (c) subject to provisions of Section 5 of this Agreement, any order, contract or agreement which is not assignable or the assignment of which would cause a breach of such order, contract or agreement; (d) all contracts with the United States Government; and (e) assets excluded pursuant to Section 1 hereof." *Id.*, § 2(a)–(e). The Agreement contains no specific transfer of goodwill other than that noted in respect to the transfer of the trademarks listed in Schedule G, nor does it contain any noncompetition covenant on the part of Sperry.

■ It is to be noted, however, that the Agreement does *specifically convey* the goodwill associated with the trademarks listed in Schedule G, which list includes the "Industriever" mark. Thus, the instrument itself did provide for the transfer of goodwill in the "Industriever" mark. The transfer of goodwill alone is sufficient to take the transfer out of the category of an assignment *in gross* so long as there is in fact goodwill associated with the mark in commerce. *Marshak v. Green*, 505 F.Supp. 1054, 1061 (S.D.N.Y.1981); *Visa, U.S.A., Inc. v. Birmingham Trust National Bank*, 696 F.2d 1371 (D.C.Cir.1982) (goodwill to which mark pertained was that of a service ancillary to the principal business of the transferor); *see also Glamorene Products Co. v. The Proctor & Gamble Co.*, 538 F.2d 894 (C.C.P.A.1976); *The Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, at 676–78 (7th Cir.1982).

■ Here, the continuing effort of Sperry, prior to the September 1, 1978, Asset Sale, to provide service, parts and technical assistance through dealers to owners of its "Industriever" units was effective to maintain the business relationship between Sperry and the owners of the units and did maintain and create goodwill in the mark "Industriever." It is significant that that mark was, as of September 1, 1978, the only trademark which such equipment bore in commerce in the United States. Since the assets of Sperry's business enterprise were conveyed to Kardex by the Asset Sale as a going operation together with the goodwill of the "Industriever" mark, the mark was transferred by the Asset Sale Agreement as appurtenant to Sperry's business and the mark's goodwill. The Asset Sale was not, therefore an *in gross* transfer of the mark separate and apart from the goodwill which it represented. *Marshak*, 505 F.Supp. 1061; *Visa U.S.A., Inc.*, 696 F.2d 1375–76.

This is not a situation where neither the mark nor the business and goodwill of the enterprise were transferred by the contract. *T & T Mfg. Co. v. A.T. Cross Co.*, 449 F.Supp. 813, 825 (D.C.R.I.1978). It is not a case where the "instrument did not purport to convey the ... [transferor's]

**820**

franchise and business." *Mendes*, 94 F.Supp. 558, 561. It is not a case where the transferor was not selling the product identified by the mark and had not done so for over six years. *Avon Shoe Co. v. David Crystal, Inc.*, 171 F.Supp. 293, 301 (S.D.N.Y.1959). This transfer was not one by a transferor who had four years previous to the attempted transfer disposed of his business and made no use of the mark thereafter. *Mister Donut*, 418 F.2d at 842.

Here, the Asset Sale Agreement transferred, by all appearances, all of the significant assets of Sperry Office Systems Division necessary to prosecute the business of that division. The Agreement included the "Industriever" assets as part of the business of that division. It specifically transferred the "Industriever" mark and the goodwill associated with it. The Asset Sale, therefore, was not an ineffective *in gross* assignment of the mark.

## IV. CONCLUSIONS OF LAW

On the basis of the foregoing findings of fact and discussion, the Court reaches the following conclusions of law:

(1) Sperry acquired the right to the exclusive use of the "Industriever" mark during the period from 1966 to June 12, 1975, by appropriation of the mark to industrial materials handling equipment utilizing the carousel technology and bearing the mark, during which time the mark came to have a secondary meaning identifying Sperry as the producer of such equipment;

(2) Sperry did not abandon the "Industriever" mark through nonuse in the period from June 12, 1975, to September 1, 1978;

(3) Sperry effectively transferred to Kardex the right to the exclusive use of the "Industriever" mark by the Asset Sale of September 1, 1978;

(4) Kardex did not abandon the "Industriever" mark through nonuse in the period from September 1, 1978, to October 27, 1981;

(5) "Industriever" is a valid common-law trademark appropriated by prior use to the identification of industrial materials handling equipment utilizing the carousel technology;

(6) Kardex owns the right to the exclusive use of the "Industriever" mark on such equipment; and

(7) Kardex has demonstrated a likelihood of success on the merits at trial on the issue of its entitlement to the right to the use of the "Industriever" mark on such equipment.

## V. ORDER

For the foregoing reasons, it is ORDERED that Plaintiff, Kardex Systems, Inc., receive preliminary injunctive relief prohibiting the Defendants, Sistemco N.V., Remstar International, Inc., and Kenneth W. Byers, as of March 22, 1984, from making any use whatever in commerce of the trademark "Industriever" for purposes of identifying, selling or inducing others to purchase any product, machine, unit or device designed for and intended to be used for materials handling and/or retrieval for industrial purposes which is manufactured, displayed, sold or offered for sale or use by the said Defendants, or any of them, during the pendency of the above-entitled action and until the entry of final judgment herein, and requiring that said Defendants, and each of them, CEASE and DESIST from the continuance of any and all such use heretofore or now made of the trademark "Industriever" in the form of a Preliminary Injunction issued by the Court on March 22, 1984, with the consent of counsel in the interest of avoiding further irreparable injury which would result from delay in the entry of said Preliminary Injunction, a copy of which is hereto annexed and is incorporated herein as "Exhibit A," PROVIDED HOWEVER that the Preliminary Injunction shall be, and is hereby, MODIFIED (1) to limit its proscriptive effect to Defendants' conduct relating to use of the "Industriever" mark within the United States of America, and (2) to require Plaintiff, Kardex Systems, Inc., to post a security bond in the amount of Fifteen Thousand

Dollars ($15,000.00) pursuant to Fed.R. Civ.P. 65(c).

So ORDERED.

## EXHIBIT A

### PRELIMINARY INJUNCTION

The Motion for a Preliminary Injunction of the Plaintiff, Kardex Systems, Inc., filed on February 10, 1984, having come on for hearing and argument before the Court on Cross-Motions for Preliminary Injunction on March 19, 1984; notice and hearing thereon having been previously ordered by the Court; the Court having this date made findings of fact and conclusions of law supporting the issuance of this Preliminary Injunction pursuant to Fed.R.Civ.P. 65(d) in its Opinion, which is of extended length; and the Court being unable to finalize and file its Opinion in formal form until March 26, 1984; and there being need for the parties to know the result reached by the Court in advance of a Materials Handling Trade Show scheduled to commence in Texas on March 27, 1984; and counsel for the parties consenting to the entry of this Preliminary Injunction on this date for the benefit of all parties hereto and in order to avoid further irreparable injury, the Court's Opinion setting out its findings of fact and conclusions of law to be filed on March 26, 1984,

It is hereby ORDERED that:

The Defendants, Sistemco N.V., Remstar International, Inc., and Kenneth W. Byers, be and are hereby ENJOINED and PROHIBITED, as of this date from making any use whatever in commerce of the trademark "Industriever" for purposes of identifying, selling or inducing others to purchase any product, machine, unit or device designed for and intended to be used for materials handling and/or retrieval for industrial purposes which is manufactured, displayed, sold or offered for sale or use by the said Defendants, or any of them, during the pendency of the above-entitled action and until the entry of final judgment herein, and

It is FURTHER ORDERED that the said Defendants, and each of them, shall forthwith CEASE and DESIST from the continuance of any and all use heretofore or now made of the trademark "Industriever" for purposes of identifying, selling, or inducing others to purchase any product, machine, unit or device designed for and intended to be used for materials handling and/or retrieval for industrial purposes now or heretofore manufactured, displayed, sold or offered for sale or use by the said Defendants, or any of them, until entry of final judgment herein.

The findings of fact and conclusions of law set out in the Court's Opinion, when filed on March 26, 1984, shall be deemed to be incorporated herein.

It is so ORDERED this 22nd day of March, 1984, at Portland, Maine.

s/ Gene Carter
GENE CARTER
United States District Judge